845 P.2d 478

**STATE of Arizona, Appellee,**

v.

**Gerardo LOPEZ, Appellant.**

**No. 2 CA–CR 90–0782.**

Court of Appeals of Arizona, Division 2, Department A.

June 23, 1992.

Review Denied Feb. 17, 1993.

Grant Woods, Atty. Gen. by Paul J. McMurdie and Galen H. Wilkes, Phoenix, for appellee.

Lingeman & Bock by Richard C. Bock, Tucson, for appellant.

## OPINION

LACAGNINA, Presiding Judge.

The primary issue in this appeal is whether a death occurred "in furtherance of" a felony under Arizona's felony murder statute when a police officer, in thwarting an attempted armed robbery, shot a co-felon, and the shooting occurred when two other co-felons claim they were under arrest. We find the felony murder statute was properly applied under the facts of this case and affirm the convictions and sentences imposed.

## FACTS AND PROCEDURAL HISTORY

In March 1989, Cesar Zamulio, a police informant, met Arnold Peterson at a car dealership in Cochise County, Arizona and began negotiations with him for the sale of

cocaine. In November 1989, Zamulio again approached Peterson about a cocaine connection. Peterson agreed to set up a deal using people he knew in the Tucson area. Zamulio and undercover Drug Enforcement Administration (DEA) agent Sproat taped conversations between Peterson and Zamulio. The parties agreed that the transaction would not take place until the cocaine had been tested and the money had been checked.

On November 16, Zamulio, Sproat and Peterson drove from Sierra Vista to a Tucson shopping center in Sproat's Chevrolet Blazer where other DEA agents and police officers had positioned themselves throughout the area. DEA agent Silva, the money man, had parked his S–10 mini-Blazer near a grocery store in the shopping center. After Peterson saw the money in Silva's mini-Blazer, he called Alex Richards, his supplier, from a pay phone. Richards then telephoned Leonard Morales and arranged for Richards and Gerardo Lopez to meet him at Morales's grandmother's house. After getting something to eat and dropping Morales's wife at home, Morales drove Richards and Lopez to the shopping center. Peterson met Morales's car, a blue Buick, in front of the grocery store and pointed out Silva's mini-Blazer and Sproat's Blazer. Morales drove down a parking lane and parked his car. Morales and Lopez then walked with Peterson over to Sproat's Blazer. After introducing themselves, Morales said he wanted to change the location because there were so many people around. Sproat said he liked having a lot of people around because it created less suspicion in doing a drug deal. Morales then said he wanted to check the money, and Morales, Lopez and Sproat walked toward Silva's mini-Blazer while Peterson stayed by Sproat's Blazer.

Morales and Richards stopped two or three parking spaces from Silva's vehicle. Lopez, Richards and Sproat continued on to the mini-Blazer. Sproat opened Silva's passenger door, introduced Lopez to Silva, and Lopez got in the passenger side. Sproat remained 12 to 15 feet in front of Silva's mini-Blazer. After Silva showed Lopez the money, Lopez drew a gun, pointed it at Silva's head and told him to drive away without saying anything to his partner. Silva started the vehicle. Lopez then pointed the pistol at Silva's ribs. Silva grabbed it and put his hand over the hammer of the semi-automatic pistol. As they struggled, the hammer came forward and struck Silva's ring finger instead of the cartridge in the chamber. Sproat then started toward the mini-Blazer. Silva saw Richards walk toward Silva, pointing a revolver towards Silva and Sproat. Officer Dillard observed Richards advancing on Silva's vehicle and pointing the pistol toward the vehicle, identified himself as a police officer and ordered Richards to put down the gun. Richards pointed the revolver at Dillard, and Dillard fired three rounds. Richards then ran between some cars. Dillard again ordered him to drop the gun. Richards brought his pistol up, and Dillard again fired. Richards continued to run, turned toward Dillard with his gun out, and Dillard fired two more rounds. Richards was shot in the right hand, the left side of the chest and the left front chest. The left front chest wound that entered the left ventricle of the heart was fatal. Silva testified he was still struggling with Lopez when he heard the shots fired. During this time, Morales had started to leave the parking lot after the officers were told to move in but before any shots were fired. Peterson testified that he had been ordered to lie on the ground and was on the ground when he heard the shots.

Peterson, Morales and Lopez were all charged with unlawful offer to sell a narcotic drug, attempted armed robbery and first-degree murder. Morales was convicted of unlawful offer to sell a narcotic drug and acquitted of the other two charges. His conviction and sentence were affirmed by this court in a memorandum decision filed July 30, 1991. Peterson was convicted of unlawful offer to sell a narcotic drug and first-degree murder and acquitted of attempted armed robbery. Peterson's convictions and sentences were affirmed in a memorandum decision filed today. *See State v. Peterson* (2 CA–CR 90–0799). Lopez was convicted of all three charges and

sentenced to concurrent terms of 25 years to life for the murder conviction, 7.5 years on the attempted armed robbery and 7 years on the unlawful offer to sell a narcotic drug. He appeals from those convictions and the sentences imposed.

## FELONY MURDER

■ Lopez argues there was insufficient evidence to support his conviction for felony murder because he was under arrest at the time the shooting occurred. Additionally, he argues he was entitled to an instruction defining arrest. Section 13–1105(A)(2) of *Arizona Revised Statutes* provides that a person commits first-degree murder if he commits or attempts to commit certain designated felonies "and in the course of and in furtherance of such offense or immediate flight therefrom, such person or another person causes the death of any person." Under the statute, the victim can include a co-felon. *See* R. Gerber, *Criminal Law of Arizona,* committee comment on A.R.S. § 13–1105(A)(2) at 161 (1978) (The phrase "any person" was substituted in the final draft for the phrase "a person *other than one of the parties to the commission of such offense.*")

■ A person is guilty of first-degree felony murder under § 13–1105(A)(2) if he causes the death of any person "in the course of and in furtherance of" the designated felony. In Arizona, that phrase has been construed to mean, "did the death result from an action taken to facilitate the accomplishment of one or more of the felonies enumerated in § 13–1105(A)(2)?" *State v. Arias,* 131 Ariz. 441, 443, 641 P.2d 1285, 1287 (1982). In this case, a police officer, not one of the co-felons, shot and killed Richards. Further, the shooting resulted from Officer Dillard's attempts to thwart and not "facilitate the accomplishment of" the robbery. However, where the killing "emanates" from the crime itself, and is a natural and proximate result thereof, it is committed in furtherance of the felony within the meaning of the statute. *State v. Moore,* 580 S.W.2d 747, 751 (Mo.1979). In *Moore,* the victim was killed by a bystander who, like Officer Dillard, was attempting to thwart the robbery. In finding the felony murder doctrine applied, the court in *Moore* stated:

> It was reasonably foreseeable that the robbery attempt would meet resistance. This set into motion the chain of events which caused the death of [the victim]. *Whether the fatal act was done by the defendant, an accomplice, another victim, or a bystander is, under the facts here, not controlling.* The significant factor is whether the death was the natural and proximate result of the acts of the appellant or of an accomplice. Of course, an independent intervening cause might relieve appellant of criminal responsibility for the killing. But in this case the act of [a bystander] was not an independent act because it was the attempted robbery by the appellant and his accomplices which provoked [the bystander] to pull the pistol he was carrying from his waistband and it was the shot fired from one of the felons which brought [the bystander's] return fire.

*Id.* at 752.

■ The trial court instructed the jury on proximate cause in this case as follows:

> A person whose deliberate acts in perpetrating a robbery or offer to sell narcotics have set in motion a chain of events which cause the death of another person, which was a risk reasonably to be foreseen, is guilty of first degree murder.
>
> A person is not held accountable for homicide when an intervening cause in which he does not participate causes death. This intervening cause must also be "supervening."

With this instruction, the jury could have found in this case that Lopez's action in pointing the gun at Silva's head set into motion a chain of events which resulted in the death of Richards. In doing so, the jury could have found that Dillard's act in shooting Richards was not an independent act, but one which was provoked by the attempted robbery.

■ However, Lopez claims he was under arrest when the shooting occurred, making the attempted robbery complete

and precluding any charge of felony murder. We disagree. First, whether or not Lopez had in fact been subdued when the shooting occurred is disputed. Assuming he had been disarmed, the felony murder rule would still apply. The Arizona Supreme Court, when faced with similar facts, found the felony murder doctrine applied.

> It is defendant's contention that at this point in time he had been subdued and that the robbery or attempted robbery was at an end. * * * There was no appreciable span of time nor appreciable change in the respective position of the parties between the disarming of defendant and the shooting; nor any overt act on the part of the defendant which would indicate to those present that he had abandoned the robbery or that it was at an end. The evidence indicates that the events which transpired immediately preceding the shooting occurred in rapid sequence and as a part of the chain of events which defendant's deliberate acts had set in motion. The clear import of the evidence is that defendant had not been subdued or even apparently subdued at that point in time when he had been seemingly disarmed.

*State v. Hitchcock,* 87 Ariz. 277, 280, 350 P.2d 681, 683 (1960).

Even if Lopez had been handcuffed or, like Peterson, ordered to lie on the ground, the jury still could have found him guilty of felony murder because his actions were the proximate cause of Richards' death. In *State v. Hokenson,* 96 Idaho 283, 527 P.2d 487, 489–492 (1974), the defendant entered a store armed with a bomb and a knife, intending to commit robbery. Following a struggle with the store owner, during which the defendant had been subdued and handcuffed, the bomb exploded, killing a police officer and injuring another police officer and the owner of the store. In affirming the defendant's conviction for first-degree felony murder, the Idaho Supreme Court stated:

> The record shows that the appellant entered the store armed with a home-made bomb and a knife with the intent to commit robbery. His handling of the bomb illustrated his full cognizance of its characteristics. The fact he was met by resistance on the part of his intended victim, and in fact placed under arrest, does not release him from the final consequence of his act.

> \* \* \* \* \* \*

> A person is criminally liable for the natural and probable consequences of his unlawful acts as well as unlawful forces set in motion during the commission of an unlawful act. The appellant voluntarily set in motion an instrumentality which carried a very real probability of causing great bodily harm. Death ensued, and the fact appellant was under arrest does not erase criminal liability.

■ Because Lopez set into action the chain of events leading to Richards' death, and did nothing to "indicate to those present that he had abandoned the robbery or that it was at an end," *State v. Hitchcock, supra* 87 Ariz. at 280, 350 P.2d at 683, he cannot escape liability for the consequences of his actions. Having found that Lopez's arrest was irrelevant to the application of the felony murder rule, we necessarily find that the trial court properly denied his instruction defining arrest.

## JURISDICTION

■ Lopez next argues that the trial court did not have jurisdiction over the offense of unlawful offer to sell a narcotic drug because all of the elements of the offense took place in Cochise County. We disagree. Although the preliminary negotiations took place between Peterson and Zamulio in Cochise County, the evidence showed that a definite offer to either sell or buy cocaine would not be made until the parties had checked out both the money and tested the cocaine at the shopping center. That occurred in Pima County. Therefore, because there was conduct constituting an element of the offense which occurred in two counties, either county had jurisdiction to hear the case. A.R.S. § 13–109(B)(1).

## JUROR MISCONDUCT

■ Lopez next argues he was entitled to a new trial because a juror wilfully

failed to respond to a direct question posed during voir dire examination, citing Ariz. R.Crim.P. 24.1(c)(3)(iii), 17 A.R.S. He claims juror Pinedo failed to inform the trial court that he did not understand sufficient English to serve as a competent juror. We find the trial court acted within its discretion in denying Lopez's motion for new trial based on this ground. Pinedo met the statutory qualifications for a juror. A.R.S. §§ 16–101 and 21–201. He was also able to understand and answer all questions on voir dire without an interpreter. In addition, at the hearing on the motion, Pinedo had no difficulty testifying and was able to answer all questions posed. Although he stated that he did not understand what the word "foreseeability" meant, he was able to tell the other jurors how he felt about the verdict. Lopez was not denied a fair trial.

## SEVERANCE

Lopez also argues he was entitled to a severance of his trial from his co-defendants because they had antagonistic defenses. We find the trial court acted within its discretion in denying the motions made during the trial and prior to closing argument. All three defendants were charged with the same offenses which arose out of the same set of facts, and the defenses were not antagonistic. Morales claimed good character. Peterson claimed entrapment. Lopez claimed reasonable doubt and that he was under arrest when Officer Dillard shot Richards. The defenses are not inconsistent or mutually exclusive. It was undisputed that Lopez held the gun to agent Silva's head; therefore, neither Morales's testimony nor Peterson's claim that he did not know the attempted robbery was going to occur would prejudice Lopez's claim of reasonable doubt and abandonment. *State v. Williams*, 144 Ariz. 433, 441, 698 P.2d 678, 686 (1985).

Affirmed.

LIVERMORE, C.J., and HOWARD, J., concur.