935 P.2d 841

**The STATE of Arizona, Appellee,**

v.

**Billy Don SMITH, Appellant.**

**No. 2 CA–CR 95–0169.**

Court of Appeals of Arizona,
Division 2, Department B.

July 11, 1996.

Redesignated as Opinion and
Publication Ordered Sept. 5, 1996.

Review Denied April 29, 1997.

Grant Woods, Attorney General by Paul J. McMurdie and Greg A. McCarthy, Phoenix, for Appellee.

Isabel G. Garcia, Pima County Legal Defender by Scott A. Martin, Tucson, for Appellant.

## OPINION

DRUKE, Chief Judge.

A jury convicted appellant of one count of child abuse and one count of first-degree murder. The charges against appellant arose after his girlfriend's one-year-old daughter, Sedona, lapsed into a coma and died of apparent non-accidental head trauma or "shaken baby syndrome." The trial court sentenced appellant to a presumptive seventeen-year prison term on the child abuse conviction and to life imprisonment on the murder conviction. None of the issues raised on appeal merits reversal.

### FACTS AND PROCEDURAL BACKGROUND

Appellant first met Sedona and her mother, Beth, in late August 1993. Both appellant and Beth made a living selling handmade crafts at swap meets and flea markets in New Mexico and Arizona. They began living and traveling together in appellant's van after Beth's ex-husband left her and Sedona.

Almost from the beginning, appellant treated Sedona as his own daughter. Beth testified that appellant acted "like a proud dad" by telling his friends and others, "This is my daughter." Beth also said that appellant wanted to adopt Sedona and "make us a family and provide for us." She also stated:

> He became very dominating as far as taking care of her. He became very insistent that he bathe her and feed her and hold her and do everything regarding the parenthood of Sedona. He said that he wanted ed to bond to her, to get her to know him as her father.

Appellant likewise dominated Beth. She testified that he "made all the decisions," "control[led] all the money," and her "place was to be his woman and be quiet."

Soon after Beth moved in with appellant, she began noticing pinch marks and bruises on Sedona's cheeks. When Beth asked appellant about them, he told her "that because [Sedona] was teething, her hands were continually in her mouth and that she was pinching herself." On two occasions, Beth also observed bruises on Sedona's forehead, which appellant attributed to accidents.

On October 15 and 16, Sedona began showing signs of illness (diarrhea, vomiting, and fever) while appellant and Beth were working at a swap meet in Socorro, New Mexico. The three left Socorro about 4:00 p.m. on October 16, intending to go to Ft. Huachuca, Arizona. However, after spending the night at a freeway rest stop, they changed their minds and decided to go to Tucson. When they later stopped at a supermarket in Benson for Beth to buy some medication for Sedona, appellant said that they were going to a lake south of the freeway because Sedona "was just teething" and would "be all right in a few days once the tooth cuts through." When Beth protested, appellant stated: "My decision is final. We're going to the lake, period."

Shortly after they arrived at the lake, Sedona stopped breathing. Beth began cardiopulmonary resuscitation and told appellant they had to get Sedona to a hospital. Appellant initially refused, claiming he would be arrested for child abuse, but then relented when Beth threatened to scream for help out the van window. When they reached the freeway and appellant began driving towards Tucson at 55 miles per hour, Beth testified that she told him to drive faster and, if he would not, to "stop a car, stop at a gas station, stop a person, stop cops, stop anybody, get us help!" Beth said appellant replied: "I'm going, I'm going as fast as I can." Beth then gave this description of their trip to the hospital:

> He said he knew that there was a hospital on the highway, but he didn't know where, and so he drove us into downtown Tucson and he says, "I can't find it," and so we turned around and went back all the way back out to the exit where the lake was, and then he said, "Okay. We're going to go back, I know it's here," so we turned around and went all the way back into downtown Tucson and still couldn't find the hospital, and at that point, I told him, "I know there is a hospital in Benson. I seen the sign when I was at the supermarket. Take me to Benson," and so we went back to Benson, and he got to the exit[ ] stop at Benson and said, "Well, Benson wouldn't have the facilities that we need, their hospital couldn't probably help us," and so he turned back around and started heading back to Tucson, and it was at that time and point that I seen out the window to Kino Hospital, I believe it was, the sign for the hospital.

When they arrived at the hospital, appellant let the two out of the van and drove away.

Beth told the medical personnel that Sedona had been ill for two or three days with vomiting and diarrhea. They later found that Sedona was suffering from profound swelling of the brain and had a "fair amount of bruising" over her body, including her genital area, and a rectal tear. Based on this, the attending physician determined that her condition was the result of non-accidental trauma, with the brain injury likely having been sustained one to three days prior to her arrival at the hospital. Sedona never came out of the coma and died after life support systems were disconnected the next day.

Appellant was charged with one count of first-degree murder (count one) and three counts of child abuse pursuant to A.R.S. § 13–3623(B)(1): one for failing to seek medical treatment (count two), one for causing retinal hemorrhages and brain injuries (count three), and one for causing rectal tears (count four). The trial court directed a verdict on count four. The jury acquitted appellant of count three and convicted him of counts one and two.

## DISCUSSION

### Failure to Seek Medical Care

Section 13–3623(B) provides, in pertinent part, as follows:

> B. Under circumstances likely to produce death or serious physical injury, any

person who causes a child ... to suffer physical injury or, *having the care or custody of such child* ... causes or permits the person or health of such child ... to be injured or causes or permits such child ... to be placed in a situation where its person or health is endangered is guilty of an offense as follows:

1. If done intentionally or knowingly, the offense is a class 2 felony and if the victim is under fifteen years of age it is punishable pursuant to § 13–604.01.

(Emphasis added.) Appellant's primary contention on appeal is that he did not have "the care or custody" of Sedona so as to be punishable under the statute for failing to seek medical care for her. We find appellant's arguments unpersuasive.

In *State v. Swanson*, 184 Ariz. 194, 196, 908 P.2d 8, 10 (App.1995), we wrote that "care" as provided in the statute, "implies the voluntary assumption of a special responsibility for [a] child...." There, the defendant was convicted of negligent child abuse for driving under the influence of alcohol with two children in his car, neither of which was his; one was the child of his live-in girlfriend, who was also a passenger in the car, and the other was the first child's friend. Given these circumstances, we reversed the defendant's child abuse conviction, holding that he had not assumed the care of the children because there was no evidence he had "supplied either child with food, shelter, medical needs, discipline, supervision or the like." *Id.*

■ That is not the case here, however. As noted above, appellant voluntarily assumed responsibility for providing for Sedona, going so far as referring to her as his daughter. He assumed the role of primary care giver by dominating Sedona's mother and controlling all the income. On this record, the jury had more than sufficient evidence to find that appellant had "care" of Sedona as required by § 13–3623(B).

Appellant further argues, however, that *Swanson* stands for the proposition that "[a] non-parent cannot share 'care or custody' for the purposes of criminal liability under the child abuse statutes with a parent who is present and capable of assuming the parental role." Nothing in *Swanson* supports appellant's position. There, we simply noted that the mother had not "relinquished 'care' of the children to the defendant" by allowing them to ride with her in the defendant's car. *Id.* We did not foreclose the possibility that a parent and a non-parent could, under circumstances such as this, share the responsibility for a child. Likewise, there is nothing in the statute prohibiting a person from assuming the care of a child while the parent remains present. The issue of whether appellant had assumed responsibility for Sedona's care was simply a question of fact the jury found against appellant, and the record supports that finding.

Appellant next contends that he cannot be held criminally responsible for his failure to seek medical care for Sedona because § 13–3623(B) imposes no legal duty upon him to do so. We disagree. By its terms, and as the jury was instructed, the statute imposes a legal duty on anyone assuming the care or custody of a child to preserve and protect the child's health. Accordingly, the trial court did not commit fundamental error, as appellant claims, when it failed to instruct the jury, sua sponte, that it must find that appellant had a duty to seek medical care for Sedona before it could find appellant guilty of child abuse.

■ We also disagree that the statute is unconstitutionally vague as applied to appellant by its failure to define "care." Under any definition, the responsibility appellant assumed in providing for Sedona constitutes "care."

Appellant further contends that his conviction for murder on a felony murder theory cannot stand because "a crime of omission may not serve as a predicate felony for felony-murder." In support of his argument, appellant cites the language of § 13–1105, Arizona's felony murder statute, which refers to a person "*[a]cting* either alone or with one or more other persons" who "commits or attempts to commit ... child abuse under Sec. 13–3623, subsection B, paragraph 1" as a predicate for felony murder. (Emphasis added.) First, notwithstanding the dicta appellant quotes from *State v. Styers*, 177 Ariz. 104, 110, 865 P.2d 765, 771 (1993), we do not believe that the legislature's use of the word "acting" was intended to preclude crimes of

omission when, as here, a person in fact commits an offense that the legislature has specifically included as a basis for felony murder. In addition, by thwarting and impeding Beth's attempts to obtain medical care for Sedona after she became ill, the jury could well have found that, under § 13–3623(B), appellant actively "cause[d] or permit[ted] such child ... to be placed in a situation where its person or health [was] endangered."

**Juror Misconduct**

Finally, we find appellant's argument that two nurses on the jury presented improper extrinsic evidence in the form of their medical experience with child abuse victims indistinguishable from that presented and rejected in *State v. Aguilar*, 169 Ariz. 180, 818 P.2d 165 (App.1991).

We reviewed the entire record in resolving this appeal and found no fundamental error. Accordingly, appellant's convictions and sentences are affirmed.

ESPINOSA, P.J., and HATHAWAY, J., concur.