937 P.2d 310

**STATE of Arizona, Appellee,**

v.

**Barry Lee JONES, Appellant.**

**No. CR–95–0342–AP.**

Supreme Court of Arizona.

April 29, 1997.

Grant Woods, Attorney General, Phoenix by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section, Christopher E. Avery,

Assistant Attorney General, Tucson, for Appellee.

Harriette P. Levitt, Tucson, for Appellant.

## OPINION

MOELLER, Justice.

### FACTS AND PROCEDURAL HISTORY

Defendant lived in a trailer park in Tucson. At the time of the murder, he had shared his trailer with Angela Gray and her three children for about three months. Defendant's daughter also lived with them. The victim in this case was Gray's youngest child, Rachel, who was four years old. On the day preceding her death, Rachel was hit many times. One blow to her abdomen was so severe that it ruptured her small intestine. Rachel also received injuries to her labia and vagina with no associated injuries to her thighs or buttocks, indicating that she had been sexually assaulted. The injuries to Rachel's genitals were contemporaneous with her other physical injuries.

The following evidence linked defendant to Rachel's injuries: on the day Rachel received her injuries, defendant left his trailer three times with Rachel in his van; two children saw defendant hitting her while he drove; defendant stopped at a Quik–Mart to get ice for Rachel's head injury; and police found traces of Rachel's blood type on defendant's clothing and in his van.

Rachel was very ill between the time of the injuries and her death—vomiting, crying, and looking very pale. During the evening, a friend and her son came to defendant's trailer. While they were there, the friend's son noticed Rachel's condition and asked defendant about it. Defendant falsely stated that he had taken Rachel to the fire department, and that the paramedics had examined her and had said she was all right. By the time defendant and Gray took Rachel to the hospital the following morning, she was already dead of peritonitis—an infection of the lining of the abdomen caused by a ruptured intestine.

Defendant was charged with one count of sexual assault (count one), three counts of child abuse (counts two, three, and four), and felony murder (count five). The trial judge instructed the jurors that two of the child abuse charges and the sexual assault charge could be predicate felonies for the felony murder charge. The trial judge further instructed the jurors that the child abuse charges could only be predicate felonies if defendant committed them intentionally or knowingly under circumstances likely to produce death or serious physical injury.

Defendant was convicted on all counts. The jurors further found that the child abuse charges that qualified as predicate felonies for felony murder were committed under circumstances likely to cause serious physical injury or death and that defendant's mental state was intentional or knowing.

At the aggravation/mitigation hearing on the murder count, the trial judge found two aggravating factors: A.R.S. § 13–703(F)(6) (especially cruel), and A.R.S. § 13–703(F)(9) (victim under the age of fifteen years). The judge found no statutory or non-statutory mitigating factors. Therefore, defendant was sentenced to death for the murder count and to terms of years for the other counts. Appeal is automatic. Ariz.R.Crim.P. 31.2(b). We have jurisdiction pursuant to Ariz.Rev. Stat.Ann. (A.R.S.) §§ 13–4031 and 13–4033 and Ariz. Const. art. VI, § 5(3). We affirm defendant's convictions and sentences.

### ISSUES PRESENTED

#### TRIAL ISSUES

I. Whether Defendant Was Properly Convicted of Child Abuse (Count Four).

II. Whether Child Abuse (Count Four) Was Properly Used as a Predicate Felony for Felony Murder.

III. Whether the Trial Court Erred by Refusing Evidence That Angela Gray Had Previously Hit One of Her Other Children.

IV. Whether the Court Erred in Denying Defendant's Motion to Sup-

press the Evidence Found in His Trailer.

V. Whether the Evidence Was Sufficient to Support a Guilty Verdict on the Sexual Assault Charge.

VI. Whether Sexual Assault Was Properly Used as a Predicate Felony for Felony Murder.

VII. Whether the Prosecutor Committed Misconduct by Referring to a Photograph That Was Not Admitted Into Evidence.

### SENTENCING ISSUES

I. Whether the Death Penalty May Be Imposed When the Court Does Not Know Which Predicate Felony the Jury Used in Finding Felony Murder.

II. Whether the Enmund–Tison Finding Was Proper.

III. Whether the Aggravating Factors, Weighed Against the Proffered Mitigation, Support the Death Penalty.

### DISCUSSION

### I. Whether Defendant Was Properly Convicted of Child Abuse (Count Four).

A person is guilty of child abuse under A.R.S. § 13–3623(B) if, while having "care or custody of [a] child," the person causes or permits the health of a child to be injured or causes or permits the child "to be placed in a situation where its person or health is endangered."[1] Defendant's challenge to his conviction for child abuse revolves around the statutory words "care or custody" and particularly the word "care." He claims that he did not have "care" of Rachel within the meaning of section 13–3623(B) and, therefore, could not be convicted of child abuse. See A.R.S. § 13–3623(B). On these grounds, defendant urged a Rule 20 motion for judgment of acquittal on Count Four, which the trial court denied.

### A. The legal standard of "care" or "custody" in section 13–3623

Neither "care" nor "custody" is defined in A.R.S. § 13–3623. When a term is not defined in a statute, the court looks first to the statute's language to determine the legislative intent, as the language is the "best and most reliable index of a statute's meaning." *State v. Williams,* 175 Ariz. 98, 100, 854 P.2d 131, 133 (1993) (quoting *Janson v. Christensen,* 167 Ariz. 470, 471, 808 P.2d 1222, 1223 (1991)). A statute is to be "construed according to the fair meaning of [its] terms to promote justice and effect the objects of the law." A.R.S. § 13–104. If the language of the statute is plain, the court looks no further. *Williams,* 175 Ariz. at 100, 854 P.2d at 133. We assume that the legislature accords words their natural and obvious meanings unless otherwise stated. *State v. Johnson,* 171 Ariz. 39, 41, 827 P.2d 1134, 1136 (1992). A dictionary may define a word's natural and obvious meaning. *State v. Bews,* 177 Ariz. 334, 336, 868 P.2d 347, 349 (App. 1993).

"Care" is defined in Webster's Third New International Dictionary as "charge, supervision, management: responsibility for or attention to safety and well-being." The example given is "under a doctor's care." "Care" is also defined as "custody" or "temporary charge." "Charge" is defined as "care, custody" and "management, supervision." "Custody" is defined as "protection, care, maintenance, and tuition." Webster's New Int'l. Dict. (3d ed. 1976). Therefore, both "custody" and "care," as they relate to A.R.S. § 13–3623, imply accepting responsibility for a child in some manner.

Defendant urges us to adopt a definition of "care" that he asserts was adopted by the court of appeals in *State v. Swanson,* 184 Ariz. 194, 908 P.2d 8 (App. 1995). Although we agree with the result in *Swanson,* we do not agree with all of its reasoning. In *Swanson,* defendant was convicted of driving under the influence of alcohol. *Id.* at 195, 908 P.2d at 9. Because he had two children as

---

1. Under A.R.S. § 13–3623, the class of felony is determined by the mental state of the defendant. If the defendant acted intentionally or knowingly, the offense is a class 4 felony; if the defendant acted recklessly, the offense is a class 5 felony; and if the defendant acted with criminal negligence, the offense is a class 6 felony. A.R.S. § 13–3623(C). The statute does not apply to actions committed with ordinary negligence. Defendant was convicted of a class 4 felony.

passengers, he was also convicted of two counts of negligent child abuse. *Id.;* A.R.S. § 13–3623(C). On appeal, the defendant argued that he should have been acquitted of the child abuse charges. The *Swanson* court agreed, finding that the defendant did not have "care" of the children within the meaning of the child abuse statute. *Id.* In doing so, the court of appeals first referred to a statutory definition of "custody" found in A.R.S. § 8–101(5):

"Custody" means a status embodying all of the following rights and responsibilities:

(a) The right to have the physical possession of the child.

(b) The right and the duty to protect, train and discipline the child.

(c) The responsibility to provide the child with food, shelter, education and ordinary medical care, and the authority to consent to surgery or other extraordinary medical care in an emergency.

A.R.S. § 8–101(5); *see Swanson,* 184 Ariz. at 195–96, 908 P.2d at 9–10. This definition of "custody" is taken from the article of the code relating to adoptions, and its application is expressly limited to that article. A.R.S. § 8–101. Nothing indicates that the legislature intended this definition to relate to the child abuse statute, and we can think of no reason why the legislature would intend any such connection. *See* A.R.S. § 8–101(5).

Having referred to the adoption code's definition of "custody," the court of appeals then went on in *Swanson* to hold that the defendant did not have "care" of his two passengers necessary to bring him within the child abuse statute. *Swanson,* 184 Ariz. at 196, 908 P.2d at 10. The court stated that the word "care" "implies more than the general duty of care owed to anyone who may be injured by one's negligence." *Id.* We agree with this finding in *Swanson.* The general duty of "care" in negligence cases, properly rejected by the *Swanson* court, has no application in a criminal case. Under A.R.S. § 13–3623, a defendant must, at the very least, be criminally negligent before he can be convicted, although one might incur civil liability under a lesser standard. Under the facts of *Swanson,* we have no quarrel with the result because no evidence proved that

defendant took responsibility for either child in any manner; he only allowed the children to ride in his car. That may have been sufficient to impose tort liability, but was not sufficient to prove criminal liability under the child abuse statute.

The court of appeals recently referred to *Swanson* in upholding a defendant's conviction for child abuse. *State v. Billy Don Smith,* 188 Ariz. 263, 935 P.2d 841 (App. 1996). We find *Smith* quite instructive. In *Smith,* the victim, Sedona, and her mother, Beth, had been living with the defendant in his van for about a month and a half before the victim died. *Id.* at 263–264, 935 P.2d at 841–42. During that time, the defendant treated Sedona like his daughter. *Id.* Beth stated, "He became very insistent that he bathe her and feed her and hold her and do everything regarding the parenthood of Sedona." *Id.* at 263, 935 P.2d at 841.

Sedona showed signs of illness about two days before she died. When Sedona stopped breathing, Beth told the defendant that they had to get her to a hospital. The defendant initially refused, claiming that he would be arrested for child abuse. *Id.* at 264, 935 P.2d at 842. However, he agreed after Beth threatened to scream out the window for help. *Id.* Nevertheless, the defendant drove around for quite awhile, making up excuses, before he actually arrived at the hospital, where he dropped them off and drove away. *Id.* at 264, 935 P.2d at 842. The defendant was convicted of felony murder and child abuse for failing to seek medical treatment. *Id.*

On appeal, the defendant argued that he should not have been convicted of child abuse because he did not have "care" or "custody" of Sedona. *Id.* at 265, 935 P.2d at 843. The court, however, found that he had care of Sedona because he "voluntarily assumed responsibility" for providing for the victim. *Id.* The court stated that whether the defendant had "care" of the child is a jury question. *Id.* The court found that the jury had sufficient evidence to find that the defendant had "care" of the child, stating, "The issue of whether appellant had assumed responsibility for Sedona's care was simply a question of

fact the jury found against appellant, and the record supports that finding." *Id.*

Accordingly, because "care" and "custody" are common terms, this court will apply their usual meanings within the context of A.R.S. § 13–3623. "Care" and "custody," in this context, require that the defendant accept responsibility for the child in some manner. Only when no substantial evidence exists to find that the defendant had "care" or "custody" of the child will a directed verdict of not guilty or a reversal of a conviction be appropriate.

## B. Factual Basis for a Finding of "Care" in This Case

When a defendant claims that evidence is insufficient to support a verdict, the appellate court does not reweigh the evidence. *State v. Guerra,* 161 Ariz. 289, 293, 778 P.2d 1185, 1189 (1989). Rather, it must view the evidence in the light most favorable to the state and thereby ascertain whether substantial evidence exists to sustain the verdict. *State v. Zmich,* 160 Ariz. 108, 109, 770 P.2d 776, 777 (1989); *State v. Barger,* 167 Ariz. 563, 568, 810 P.2d 191, 196 (App.1990). A judgment of acquittal under Rule 20 is appropriate only when "no substantial evidence [exists] to warrant a conviction." Ariz. R.Crim. P. 20(a). "Substantial evidence" is "evidence that would convince an unprejudiced thinking mind" about the truth of the fact for which the evidence is presented. *State v. Atwood,* 171 Ariz. 576, 597, 832 P.2d 593, 614 (1992). "If reasonable [persons] may fairly differ as to whether certain evidence establishes a fact in issue, then such evidence must be considered as substantial." *State v. Tison,* 129 Ariz. 546, 553, 633 P.2d 355, 362 (1981) (citations omitted).

In this case, substantial evidence exists for a jury to find that defendant had "care" or "custody" of Rachel. He accepted responsibility for Rachel by his actions. Angela Gray and all three of her children moved into defendant's trailer about three months before Rachel died. Defendant provided food and shelter for the family. He acted as a caregiver to all of Gray's children and was, in essence, their stepfather, although not married to their mother. Rebecca, Gray's eleven-year-old daughter, testified that she had to ask permission of her mother or defendant before she could go outside and play. On the day that Rachel's injuries occurred, Rebecca had asked defendant's permission twice to go outside: once to go to a friend's house and once to ride her bike. Rebecca testified to the manner in which defendant disciplined—by sending the child to his or her room. Additionally, defendant told the children that they were not allowed to play in his van because he had tools and other things in it that might hurt them. Defendant clearly accepted responsibility for Rachel by taking her out alone with him on three separate occasions on the fateful day. He continued to assert responsibility over her by telling people who were concerned about her condition that he had taken her to the paramedics and they had pronounced her all right.

Having assumed responsibility for Rachel, it would be anomalous in the extreme to find that defendant's responsibility for her ended when he deliberately inflicted the fatal injuries upon her. The jury received substantial evidence to find that defendant had care or custody of Rachel within the meaning of A.R.S. § 13–3623.

## II. Whether Child Abuse (Count Four) Was Properly Used as a Predicate Felony for Felony Murder.

Our holding that the child abuse conviction is proper disposes of defendant's argument that it cannot be used as a predicate felony for felony murder.

## III. Whether the Trial Court Erred by Refusing Evidence That Angela Gray Had Previously Hit One of Her Other Children.

We review a trial court's decision regarding admissibility of evidence only for clear abuse of discretion. *State v. King,* 180 Ariz. 268, 275, 883 P.2d 1024, 1031 (1994); *see also State v. Williams,* 132 Ariz. 153, 157, 644 P.2d 889, 893 (1982). Defendant offered evidence that Angela Gray had spanked her older daughter, Rebecca, "hard," and that the spankings stopped when Gray and her

children moved in with defendant. The trial court refused to admit the proffered evidence. Defendant argues that the evidence should have been admitted under Rule 404(b) of the Arizona Rules of Evidence to show that Gray was the likely perpetrator of Rachel's beating and that defendant had "nonviolent" tendencies.

Evidence of other acts is not admissible to prove a person's character to show that the person acted in conformity with the prior acts. Ariz.R.Evid. 404(b). The evidence may be admissible for other purposes, however, such as to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.*

Before a defendant may produce evidence that someone else may have committed the crime, "the defendant must show that the evidence has an inherent tendency to connect such other person with the actual commission of the crime. Vague grounds of suspicion are not sufficient." *State v. Fulminante*, 161 Ariz. 237, 252, 778 P.2d 602, 617 (1988), *aff'd*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

Defendant offered evidence of a "hard spanking" by Gray of Rachel's older sister, which allegedly occurred more than ninety days before Rachel's murder. In our view, the evidence does not have an inherent tendency to connect Gray to the commission of the sexual abuse and murder of Rachel. We find that the trial court did not abuse its discretion in precluding the introduction of the evidence.

## IV. Whether the Trial Court Erred in Denying Defendant's Motion to Suppress the Evidence Found in His Trailer.

Defendant moved to suppress evidence found in his trailer during the execution of a search warrant. He argues that an earlier illegal warrantless entry disclosed evidence that was later used, in part, to obtain the search warrant. The state contends the earlier warrantless entry was justified as a welfare check on the other children known to live at the trailer.

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. Similarly, the Arizona Constitution provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." Ariz. Const. art. II, § 8. To fulfill these constitutional requirements, courts usually require the government to obtain a search warrant before it can search a person's home. However, courts have also created exceptions to the requirement of a warrant under certain circumstances. One of those exceptions is the "emergency aid" exception, which permits police to enter a home without a warrant "in the reasonable, good-faith belief that there is someone within in need of immediate aid or assistance." See *State v. Fisher*, 141 Ariz. 227, 240, 686 P.2d 750, 763 (1984), and numerous federal and state authorities cited therein. The "emergency aid" exception focuses on public welfare or safety, and it may be invoked without regard to whether the police have probable cause to obtain a warrant. *Id.* The reasonableness of a police officer's entry under the "emergency aid" exception is a question of fact for the trial court. *Id.* at 238, 686 P.2d at 761. We will not disturb the trial court's ruling on appeal absent clear and manifest error. *State v. Stanley*, 167 Ariz. 519, 523, 809 P.2d 944, 948 (1991).

In *Fisher*, this court set forth three factors for appellate courts to use in evaluating when a warrantless entry is justified under the "emergency aid" exception: (1) whether police have reasonable grounds to believe that an emergency exists and that someone needs assistance for the protection of life and property; (2) whether the search is primarily motivated by intent to arrest or to seize evidence; and (3) whether there is a reasonable basis to associate the emergency with the place to be searched. 141 Ariz. at 237–38, 686 P.2d at 760–61. We examine each of these factors.

### A. Reasonable grounds to believe an emergency exists

The record supports the trial court's finding that the police had a justifiable concern about the welfare of the other children. An

officer observed the condition of Rachel's body at the hospital. He discussed the case with hospital staff. Angela Gray's explanation about what happened to Rachel did not comport with Rachel's injuries. The officer knew that defendant had left the hospital to check on the other three children and had not returned. He then contacted a police sergeant and advised her that Rachel's death was suspicious and that officers should go to the trailer to check on the welfare of the other children and preserve any scene that might be at the trailer. When officers arrived at the trailer, no vehicle was found. The officers knocked on the door; no one answered. The door was unlocked, so the officers entered the trailer to search for the children. During that time, they saw, but did not seize, a bloody towel on the couch. They were in the trailer for about ninety seconds, just long enough to determine that the children were not present.

### B. Primary motivation for the search

The United States Supreme Court has held that a warrantless search must be "strictly circumscribed by the exigencies which justify its initiation." *Terry v. Ohio*, 392 U.S. 1, 25–26, 88 S.Ct. 1868, 1882, 20 L.Ed.2d 889 (1968). If the police actions exceed those necessary to meet the exigencies, "assertions that they were motivated by the exigencies alone must be strictly scrutinized." *Fisher*, 141 Ariz. at 239, 686 P.2d at 762.

The officers stayed in the trailer for approximately ninety seconds, only long enough to look for the children. They saw a bloody towel on the couch but did not disturb it or search for other evidence. Instead, they secured the trailer and waited for sheriff's officers to take other action. *See id.* (holding warrantless entry under the circumstances to be reasonable when police were inside for no more than two minutes). The evidence confirms that the officers' primary motivation in entering the trailer was to protect the welfare of the children.

### C. Reasonable basis to associate the emergency with the place to be searched

The officers had reasonable grounds to associate the emergency with defendant's trailer. Angela Gray told the officer that defendant had returned to the trailer to check on the welfare of the other children. This, combined with the fact that she told them a suspicious story, gave the officers reasonable grounds to check the trailer to ensure the safety of the other children.

Because the officers' warrantless entry was justified under the "emergency aid" exception, the entry was lawful. Therefore, the information concerning the bloody towel that the officers saw in plain view upon searching the trailer was permissibly used, along with other evidence, to obtain a search warrant. Because we conclude that the original warrantless entry was proper, we do not reach the state's alternative argument that the evidence later seized pursuant to the search warrant was also admissible under the independent source doctrine.

### V. Whether the Evidence at Trial Was Sufficient to Sustain a Guilty Verdict on the Sexual Assault Charge.

■ Defendant contends that the evidence is insufficient to support his conviction for sexual assault. Sexual assault is defined as "intentionally or knowingly engaging in sexual intercourse ... with any person without consent of such person." A.R.S. § 13–1406(A). Sexual intercourse is "penetration into the ... vulva ... by any part of the body or by any object." A.R.S. § 13–1401(3). Defendant concedes that "it was obvious the child had been assaulted." However, he claims there was insufficient evidence to connect him to the crime.

Viewing the evidence in the light most favorable to the state, substantial evidence supports defendant's conviction for sexual assault. *See Atwood*, 171 Ariz. at 596–97, 832 P.2d at 613–14; *Zmich*, 160 Ariz. at 109, 770 P.2d at 777; *State v. Blevins*, 128 Ariz. 64, 623 P.2d 853 (App.1981) (holding that evidence may be either direct or circumstantial, and the probative value of the evidence is not reduced simply because it is circumstantial). Defendant concedes, and the evidence supports, that Rachel was sexually assaulted. The medical examiner testified regarding the

extent of injuries to Rachel's genitalia. The labia, or outside genitalia, were bruised and scraped, and the opening of her vagina was torn about one half inch in length and about three-sixteenths of an inch in depth. The examiner testified that her vaginal injuries were consistent with penetration or attempted penetration and that the injury to her vaginal opening indicated penetration through the vulva. Additionally, the location of her injuries with no associated injuries on her thighs or buttocks is consistent with a nonaccidental injury. Rachel also had many defensive wounds, indicating that she had attempted to protect herself. The defensive wounds included injuries to both of her hands, her fingers, her forearms, her knees, and her right leg.

Evidence supports the conclusion that virtually all of Rachel's injuries occurred within a two-hour period. Rachel's sister, Rebecca, testified that Rachel spent the morning with her and their brother watching cartoons. Rachel "seemed fine" when her siblings went out to ride their bikes, about 3:00 p.m. Additionally, Rachel "seemed fine" after the first two times that she returned with defendant. Rachel first accompanied defendant to the market. Rebecca saw Rachel standing at the door when they returned, and she seemed fine. The second time defendant returned with Rachel, Rebecca again saw her standing at the door, and Rachel appeared to be fine. If Rachel had already suffered genital injuries, she would have been in pain. The examiner testified at the aggravation/mitigation hearing that the genital injuries would have caused pain at basically all times. The third time that defendant went out with Rachel, he told Rebecca that he was going to his brother's house. However, his brother's wife testified that defendant never visited their house on that day. During defendant's third trip with Rachel, two children saw defendant hitting Rachel while he drove. One of the children placed the time at 5:00 p.m. Blood spatter in the van likely was created by defendant hitting Rachel after she had already suffered a head injury. Additionally, blood spatter consistent with Rachel's blood type was found on defendant's jeans, along with traces of blood on defendant's shirt and boots. The next time that Rebecca saw Rachel, at about 6:30 p.m., Rachel was in a lot of pain. Many of the injuries that Rachel now had were consistent with defense against a sexual assault. Thus, substantial evidence was introduced to conclude that Rachel's physical assault and sexual assault all occurred within the two-hour time period during which she was alone with defendant in his van.

The evidence of the time period of Rachel's injuries, the testimony that defendant was seen hitting her, the fact that Rachel was fine before she went out with defendant the third time and was injured when she returned, and the fact that defendant told others that he had taken Rachel to see the paramedics when he had not, support the finding that defendant committed the sexual assault along with, and as part of, the overall physical assault. Consequently, we find that sufficient evidence exists to sustain defendant's sexual assault conviction.

## VI. Whether Sexual Assault Was Properly Used as a Predicate for Felony Murder.

Defendant argues that sexual assault is not a valid predicate for felony murder in this case for two reasons. First, he claims the evidence is insufficient to support the conviction for sexual assault. We have, however, concluded otherwise. Second, he contends that the evidence will not support a finding that the death occurred in furtherance of the crime of sexual assault or in immediate flight therefrom. We first note that this contention is somewhat academic because defendant was also convicted of inflicting the precise injury (Count II) (the blow to the abdomen that ruptured the intestine) that unquestionably was the direct cause of death. Based on the record, therefore, it is likely that the felony murder finding on that count was unanimous. However, we also find that defendant caused the death in furtherance of the sexual assault.

A death is in furtherance of an underlying felony if the death resulted from an action taken to facilitate accomplishment of the felony. *State v. Hallman*, 137 Ariz. 31, 38, 668 P.2d 874, 881 (1983); *State v. Arias*,

131 Ariz. 441, 443, 641 P.2d 1285, 1287 (1982). Substantial evidence exists to find that Rachel's death occurred in furtherance of the sexual assault. All of Rachel's defensive wounds occurred during the same short time period as Rachel's genital injuries. The wounds to her knees were consistent with the tendency to lift one's knees when one is on the ground and trying to protect oneself. The injury that caused Rachel's death, the laceration of the small intestine, also occurred during the same time period. As discussed above, Rachel was alone with defendant in his van during the relevant time period. Defendant was seen hitting Rachel while driving his van, and she was crying. Rachel was not injured before she went with defendant the third time but was hurt when she returned. Substantial evidence exists that defendant committed both the physical assault and the sexual assault during the same time period. Therefore, we find substantial evidence to support defendant's conviction.

Defendant argues that it is illogical to assume that a man would have to beat a small four-year-old girl to sexually assault her. We say that it is equally illogical to assume that a grown man would have to beat a twenty-eight pound girl for any reason. Yet Rachel was severely beaten by defendant, and the defensive wounds on her body show that she was trying to protect herself, even though her attempts proved futile. Rachel's death could legitimately be found to be the natural and proximate result of defendant's acts in facilitating the sexual assault. *See State v. Lopez*, 173 Ariz. 552, 555, 845 P.2d 478, 481 (App. 1992). Therefore, we hold that the sexual assault is a valid predicate felony for the felony murder conviction.

## VII. Whether the Prosecutor Committed Misconduct by Referring to a Photograph That Was Not Admitted Into Evidence.

■ Although defendant made no objection at trial, on appeal he contends that the prosecutor committed misconduct by allowing the medical examiner to testify regarding a picture that was not admitted into evidence. During the examiner's testimony, the prosecutor asked that two autopsy photos showing Rachel's external genitalia be admitted. (Exhibits 136 and 137.) Defendant objected to their admission on grounds of gruesomeness. In response, the trial court addressed the prosecutor as follows: "It seems to me you can get by explaining there was some blood, though not set out there. I am going to suggest that you use that one instead of that one, but not both." The prosecutor then used Exhibit 136, which was admitted, and asked the examiner to describe the difference between Exhibit 136 and Exhibit 137.

The examiner explained that the injuries and the blood and fluid from the injuries were visible in Exhibit 137 and that Exhibit 136 was taken after the blood and fluid had been cleaned away. He stated that he used the presence of the pooled blood, the appearance of the injury, and microscopic examination of tissue samples to estimate the time of the injury.

■ Defendant did not object to the questioning of the examiner in this fashion, nor did he assert any claim of prosecutorial misconduct in the trial court. Failure to object at the time of trial waives the claim on appeal, absent fundamental error. *State v. West*, 176 Ariz. 432, 445, 862 P.2d 192, 205 (1993) (citing Ariz. R.Crim. P. 21.3). We have held that error is fundamental only when it is "clear, egregious, and curable only via a new trial." *State v. Gendron*, 168 Ariz. 153, 155, 812 P.2d 626, 628 (1991). The prosecutor's questioning of the medical examiner, which contained a reference to the unadmitted Exhibit 137, did not approach fundamental error.

## SENTENCING ISSUES

## I. Whether the Death Penalty May Be Imposed When the Court Does Not Know Which Predicate Felony the Jury Used in Finding Felony Murder.

We have resolved part of this issue by determining that sufficient evidence exists to sustain defendant's convictions on the challenged predicate felonies. Further, we have previously rejected defendant's contention that a unanimous verdict on the theory of

felony murder is required. *See State v. Lopez,* 163 Ariz. 108, 111, 786 P.2d 959, 962 (1990).

## II. Whether the *Enmund–Tison* Finding Was Proper.

 A person convicted of felony murder is only eligible for a death sentence if he killed, attempted to kill, or intended that a killing take place, *Enmund v. Florida,* 458 U.S. 782, 797, 102 S.Ct. 3368, 3376, 73 L.Ed.2d 1140 (1982), or was a major participant in the felony and acted with reckless disregard for human life. *Tison v. Arizona,* 481 U.S. 137, 157–58, 107 S.Ct. 1676, 1688, 95 L.Ed.2d 127 (1987). Defendant alleges that Angela Gray had a higher duty of care to Rachel than defendant and, therefore, she was responsible for Rachel's death by not taking Rachel to the hospital. Based on this assertion, he argues he is not responsible for Rachel's death, and, therefore, the *Enmund–Tison* finding must fall. Nothing in law or logic supports the proposition that only one person can bear responsibility for a child's death. Indeed, in this case, the mother was also charged with murder and child abuse, and her trial was severed from defendant's. We emphatically reject defendant's suggestion that a parent's guilt exonerates a non-parent, much as did the court of appeals in *Smith. See State v. Billy Don Smith,* 188 Ariz. 263, 935 P.2d 841 (App.1996).

In *State v. Bolton,* 182 Ariz. 290, 896 P.2d 830 (1995), we held that, based on the jury instructions, the jurors had found beyond a reasonable doubt that the defendant killed the victim. *Id.* at 315, 896 P.2d at 855. That finding satisfied *Enmund. Id.* Similarly, in this case, the jury's verdict on Count II (direct physical injury to Rachel) and Count V (felony murder) required a finding beyond a reasonable doubt that defendant killed Rachel. The medical examiner testified that Rachel's death was caused by peritonitis after the rupture of her small intestine was left untreated. The jury convicted defendant of causing the rupture of Rachel's small intestine, the specific injury that led to her death (Count II). This supports a death eligible finding under *Enmund.* In addition, defendant is also clearly death eligible under *Ti-*

*son,* as he was not only a major participant in the underlying felonies, but was the sole participant in the assault of Rachel, and he obviously acted with reckless disregard toward human life.

## III. Whether the Aggravating Factors, Weighed Against the Mitigating Factors, Support Imposing the Death Penalty.

This court independently determines whether aggravating or mitigating circumstances exist and reweighs them to determine if a death sentence is appropriate. A.R.S. § 13–703.01.

### A. Aggravating factors

Defendant's death sentence was based upon two aggravating factors: especially cruel, A.R.S. § 13–703(F)(6), and victim under the age of fifteen, A.R.S. § 13–703(F)(9).

### 1. Especially cruel, A.R.S. § 13–703(F)(6)

 The trial court found the murder was especially cruel within the meaning of A.R.S. § 13–703(F)(6). A murder is especially cruel when the murderer inflicts mental or physical pain upon a conscious victim before death. *State v. Greenway,* 170 Ariz. 155, 165, 823 P.2d 22, 32 (1991). When the suffering is experienced after the infliction of a fatal wound, that suffering must have been "objectively foreseeable" to support a finding of cruelty. *Bolton,* 182 Ariz. at 311, 896 P.2d at 851. The defendant's subjective intent to cause suffering is irrelevant. *Id.* at 312, 896 P.2d at 852.

Here, the evidence establishes that Rachel suffered from physical pain for many hours after she was assaulted. She was crying and vomiting and had bruises on her face, fingers, and hands. The emergency room physician testified that the blow to Rachel's bowel would have caused great pain initially and would have continued to cause pain to a lesser extent thereafter. Rachel also experienced pain from her genital injuries. The defensive wounds on her body show that she was conscious during her beating. *See State v. (George Molina) Lopez,* 174 Ariz. 131, 143–44, 847 P.2d 1078, 1090–91 (1992) (finding cruelty when a one-year-old victim died of

blunt-force trauma to the head, abdomen, and chest; doctor testified that the victim must have suffered for about 45 minutes from the injuries).

Defendant knew how severely he had beaten Rachel. Her body showed signs of being struck dozens of times by fists, elbows, and perhaps blunt instruments. Rachel was physically sick for the rest of the evening. Additionally, defendant told others that he had taken Rachel to the paramedics even though he had not, which may have prevented others from seeking medical help for her. He deliberately extended her suffering by not taking her to the hospital and by misleading others who might have. It is beyond question that Rachel suffered especial cruelty within the meaning of section 13–703(F)(6) during her terrifying last day of life.

### 2. Victim under the age of fifteen, A.R.S. § 13–703(F)(9)

The trial court found the aggravating factor of A.R.S. § 13–703(F)(9), which applies when the defendant is an adult and the victim is a person under the age of fifteen. Defendant was an adult and Rachel was four years old. The (F)(9) factor is satisfied.

### B. Mitigating Factors

■ The defendant must establish mitigating factors by a preponderance of the evidence. *State v. McMurtrey*, 143 Ariz. 71, 73, 691 P.2d 1099, 1101 (1984). Defendant presented evidence attempting to prove that drug abuse, a dysfunctional family, and Angela Gray's responsibility to care for her daughter were mitigating factors. We will discuss each of these factors.

### 1. Drug addiction and intoxication

■ Defendant argues that he produced sufficient evidence of drug addiction and intoxication for the court to find a mitigating circumstance. Voluntary intoxication may be a mitigating factor if the defendant proves by a preponderance of the evidence that his "capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution." A.R.S. § 13–703(G)(1); *see also State v. Stokley*, 182 Ariz. 505, 520, 898 P.2d 454, 469 (1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 787, 133 L.Ed.2d 737 (1996). However, "[n]ot being able to 'think clearly in reality' ... is not coextensive with not having the capacity to appreciate the wrongfulness of one's conduct." *State v. Atwood*, 171 Ariz. 576, 651, 832 P.2d 593, 668 (1992).

An expert testified that defendant began using drugs when he was a teen and was a heavy user of methamphetamine at the time of the murder. The evidence of defendant's drug use at the time of the murder was self-reported; however, expert testimony corroborated defendant's testimony. The defense expert stated that methamphetamine users tend to stay awake for several days and then "crash" for several days at a time. Additionally, defendant's sister-in-law and girlfriend testified that defendant consumed methamphetamine on Saturday, the day before the incident. However, no testimony establishes, either because of his use of drugs or because he was coming down off of the drugs, that defendant could not appreciate the wrongfulness of his conduct or conform his conduct to the law. All of the people who testified for defendant claimed that they had never seen defendant hurt anyone, when he was on or off of drugs. The trial court properly concluded that not enough evidence had been produced to show that defendant was impaired by methamphetamine use to constitute statutory or non-statutory mitigation.

### 2. Dysfunctional Family

■ A dysfunctional family is a mitigating circumstance only if the defendant "can show that something in [his] background had an effect or impact on his behavior that was beyond his control." *Bolton*, 182 Ariz. at 314, 896 P.2d at 854. Defendant's mother testified at the aggravation-mitigation hearing regarding his childhood, including the fact that she taught him right from wrong. Although defendant did not have a perfect childhood, no evidence exists of a dysfunctional childhood that would affect his reasoning and conduct at the time of this incident.

### 3. Responsibility of Rachel's mother

■ Defendant argues that the court should have found a non-statutory mitigating

factor to be that Angela Gray was largely responsible for Rachel's suffering. Defendant claims that Gray's lack of action by not taking her child to the hospital should be considered an intervening factor, so that defendant should not be solely responsible for Rachel's death. We have previously discussed this argument in our *Enmund–Tison* discussion. *See* Sentencing Issues, Pt. II.

The trial court did not specifically address Gray's involvement as a non-statutory mitigating circumstance. However, the trial court indicated that it had considered all of the mitigating evidence presented by defendant and found it insufficient to call for leniency.

Defendant's attempt to transfer responsibility for Rachel's death to Gray is meritless. Defendant was with Rachel the balance of the evening after he inflicted the assault upon her. He knew better than anyone else the suffering she was experiencing. He told people, in Gray's presence, that he had taken Rachel to see the paramedics and that they had said she was fine. Not only did he not take Rachel to the hospital when he knew how much she was suffering, he also effectively dissuaded others from taking her to the hospital by telling them that he had taken her to the paramedics. Even though Rachel was not his biological child, he had a duty to take her to the hospital after he inflicted the injuries upon her.

## CONCLUSION

Two aggravating factors support the death penalty: A.R.S. § 13–703(F)(6) (especially cruel), and A.R.S. § 13–703(F)(9) (victim under the age of fifteen years). No statutory or nonstatutory mitigating factors have been established by a preponderance of the evidence.

The convictions and sentences are affirmed.

ZLAKET, C.J., JONES, V.C.J., and FELDMAN and MARTONE, JJ., concur.