OPINION
{¶ 1} Defendant-appellant, Alan J. Butts, was indicted on charges of murder, involuntary manslaughter, felonious assault and two counts of endangering with regard to the death of Jayden Unger. After a jury trial, appellant was found guilty of all five counts. Appellant was sentenced to a term of 15 years to life imprisonment on Count 1, murder; six years for Count 3, felonious assault; six years for Count 4, endangering children; and four years for Count 5, endangering children, all to run concurrently. Count 2, involuntary manslaughter, was merged with Count 1. Appellant filed a notice of appeal and raises the following assignments of error:
I. The judgment of conviction in the within case is not supported by the quantum of evidence required by law. it is therefore, contrary to law.
II. The finding of the jury is against the manifest weight of the evidence.
 {¶ 2} Columbus Police Officers Tim Keller and Michael Holbrook arrived first on the scene on February 13, 2002. They had been dispatched to an apartment because of a hang-up of a 911 call, followed by a second call, and found two-year old Jayden Unger unconscious on the living room floor. When the police arrived at the address, appellant beckoned the police inside. Both officers testified Jayden was pale, cold to the touch and turning blue around his lips and nails. One officer started CPR, the other questioned appellant, who told the officer that he had been playing with a Sony Play Station when Jayden put his arms up in the air, tilted his head back, and fell over and struck his head on the carpet. Within minutes of their arrival, and after the officers indicated that the scene was safe, the paramedics entered the apartment and took charge of treating Jayden.
 {¶ 3} Jayden's mother, Beth Unger, testified that she has known appellant for two and one-half years, he is her boyfriend and, on February 13, 2002, she lived with appellant and her son. Jayden had been sick for approximately one week. He had been dizzy, not as talkative, not as active, falling more often and just not acting like himself. She had been giving him Triaminic, and had discussed taking Jayden to the doctor but she had not taken him yet. That Saturday, appellant and Jayden took her to work at approximately 1:00 p.m. She received a telephone call while at work that Jayden had fallen and was being lifeflighted to Children's Hospital. Jayden died the next day, on February 14, 2002, after being taken off life support. She stated that appellant acted in a very loving way towards Jayden and treated him as if he were his own son. She never saw appellant do anything abusive or inappropriate, and Jayden called appellant "Dad." (Tr. at 48.)
 {¶ 4} Sean Condron, a friend of appellant, testified that he went to appellant's house at approximately 1:00 p.m., to play Sony Play Station with appellant. Jayden was a little "fussy," but Condron saw him eat a cookie and drink some juice before he left at approximately 2:30 p.m. (Tr. at 53.) Appellant put on music for Jayden and let him push buttons on the video game.
 {¶ 5} Several paramedics testified about Jayden's condition and the treatment rendered. Twelve minutes elapsed from the time of the original dispatch until the time the paramedics began working on Jayden. Upon arrival, Jayden was on the floor on his back and appeared pale, limp, cold, had a blue tint around his lips and was not moving. He had no pulse and no heart rate. As he did not respond to a chest rub, he was intubated and given oxygen, but did not revive. He was given a total of six doses of epinephrine, a drug to start the heart. Three minutes must elapse between each dose. The paramedics were able to restart Jayden's heart, lost the heart beat and started it again. He was taken by Medflight to Children's Hospital. While on Medflight, his heart stopped again and he was given another dose of epinephrine. The Medflight nurse testified that Jayden's pupils were fixed and fully dilated, which is usually an indication of severe brain damage either from an event or anoxia, which is a lack of oxygen to the brain.
 {¶ 6} Jayden arrived at Children's Hospital in a life-threatening situation. As explained by the pediatric surgeon and director of the trauma program at Children's Hospital, Dr. Jonathon Groner, when Jayden arrived he was comatose, intubated, had various IVs and his body temperature was 91 degrees, which meant that he either had a very long resuscitation or some interval passed between the time of injury and until he entered the healthcare system. CT scans of his head and abdomen were conducted and an ophthalmologist did an exam. The next afternoon he was taken off life support and died. The final diagnosis was that Jayden died of a head injury believed to be shaken baby syndrome.
 {¶ 7} Charles F. Johnson testified as an expert in the area of child abuse. He currently works as a staff physician in the child advocacy program at Children's Hospital and is board certified in pediatrics. He explained how head injuries occur in children, and distinguished the model he used for demonstrative purposes, which was of a newborn, from brain injuries in toddlers or adults. He explained what injuries a doctor would expect to find in a child that had experienced shaken baby syndrome, including subdural bleeding, no external injuries except rarely rib fractures or unusual fractures of the legs, retinal hemorrhages in 85 percent of the cases, and bleeding in the sheath of the nerves from the eyes to the skull which can be detected only during an autopsy.
 {¶ 8} Dr. Johnson conducted a consultation of Jayden while he was at Children's Hospital on February 14, 2002. He reviewed the hospital chart, discussed the x-rays with a pediatric neuroradiologist, examined Jayden, spoke to the charge nurse, the mother, the maternal grandparents and two aunts, looked at the x-rays, CT scans and reviewed the laboratory work. Dr. Johnson testified that the CT scan showed edema, which means swelling or fluid; subdural blood, which is bleeding that is under the covering of the brain, between the dura and the brain; and swelling of one side of the brain. Jayden also had hypoxic injury to his lungs and bowels, as the result of oxygen deprivation. Dr. Johnson testified that he would not expect a fall to the floor to cause a child to be unconscious, have a seizure or die, nor would he expect optic nerve hemorrhages, or constellation of subdural hemorrhages and retinal hemorrhages. A standing fall to the floor could not have been the cause of the injuries because there is an insufficient distance to the floor, there was no evidence of external injury, no fracture and no epidural hemorrhage. Dr. Johnson believed the injury occurred after the time that Jayden ate a cookie and juice because, after suffering an injury of this severity, he would not expect a person to be capable of sophisticated neurofunction and believes that Jayden would have been unconscious within seconds or minutes of the injury. Dr. Johnson was asked if Jayden had fallen and hit his head on a porcelain bathtub and experienced several other falls in that prior week, if the cumulative effect of the falls was a concern, and he answered that the cumulative effect would not lead to death. Dr. Johnson concluded that the history that was given to him did not explain the injuries and he believes Jayden experienced a non-accidental head injury with primarily an acceleration-deceleration component, shaken baby syndrome.
 {¶ 9} Jayden's treating pediatric surgeon at Children's Hospital, Dr. Groner, was certified as an expert in pediatric medicine. Dr. Groner testified that Jayden's injuries to his brain as seen on his CT scan and injuries to his eyes are not consistent with a fall from standing height. He believed Jayden's injuries would have been immediately incapacitating. He also stated that several falls in the week before Jayden's death would not have caused the optic nerve hemorrhages or the retinal hemorrhages.
 {¶ 10} The attending physician at Children's Hospital, Karla Hauersperger, described Jayden's condition upon arrival at the hospital and the procedures which were performed. She stated that the head CT scan showed that there was blood collection around the surface of the brain and into the different folds of the brain, and diffused cerebral edema or swelling of the brain. Jayden also had retinal hemorrhages to both eyes. The paramedics' report listed in the history that Jayden had slipped and fallen, but Dr. Hauersperger testified that history and the degree of injury were incompatible. Her conclusion was that Jayden sustained a non-accidental head injury, most consistent with shaken baby syndrome, and the injury would have been immediately incapacitating.
 {¶ 11} The coroner who conducted the autopsy on Jayden testified that Jayden had some bruises, an ill-defined area of hemorrhage into soft tissues around his left ear, an area of hemorrhage that was ill-defined in the right occipital scalp in the back of his head, subdural hematoma or hemorrhage, cerebral edema, hemorrhage around the spinal cord which was probably due to being on his back at the hospital, hemorrhage in the sheath around both optic nerves and hemorrhage into his retina in the left eye. The coroner opined that it was highly unlikely that his injuries could have been caused by a fall because there was no point of impact where he hit his head, and, to cause such injuries by a fall, the fall had to have been from a height greater than five to ten feet. The coroner believed that Jayden's injuries lead to the conclusion that the cause was shaken baby or shaken impact syndrome, where the child hits something while being shaken. The information about prior falls by Jayden did not alter the coroner's opinion regarding the cause of the injuries because there was no evidence of any significant head trauma from prior falls.
 {¶ 12} Appellant testified that Jayden had fallen in the bathtub five to seven days prior to the incident and there was a dramatic change in his behavior after the fall; Jayden did not eat or talk as much and he wanted to be held more often. On February 13, he and Jayden took Beth to work and, after they returned, a friend visited and they played video games. After the friend left, Jayden fell over, and, when appellant investigated, Jayden was nonresponsive. He testified that he loved Jayden and he did not injure, shake or strike him.
 {¶ 13} John Plunkett, M.D., a laboratory and medical education director at Regina Hospital in Hastings, Minnesota, who is board certified in anatomic pathology, clinical pathology and forensic pathology, testified on behalf of appellant. Dr. Plunkett reviewed copies of Jayden's medical records from Children's Hospital, the autopsy report, photographs and slides.
 {¶ 14} Dr. Plunkett testified that there is a scientific invalidity with the concept of shaken baby syndrome because one does not cause injuries usually associated with shaken baby syndrome by shaking a child. He believes that the theory of retinal bleeding being a sign of shaken baby syndrome is not a valid assessment.
 {¶ 15} Dr. Plunkett reviewed the readings of the CT scans, but not the CT scans themselves, and testified it showed a loss of gray/white matter distinction in the brain, something that occurs or is seen 12 to 24 or more hours after an injury or event. He believes that the CT scan strongly suggests that the brain swelling started 12 to 24 hours or more prior to Jayden's admission to the hospital. He believes Jayden's cause of death was brain swelling probably due to impact injury and may have been complicated by pneumonia. He testified that Jayden's behavior the week before, which included not eating, being fussy and lack of coordination, were consistent with a pre-existing head injury possibly suffered from the fall in the bathtub.
 {¶ 16} Dr. Plunkett did not think that Jayden died of shaken baby syndrome because appellant would need to generate 2,400 pounds of force to cause such injuries based on Jayden's weight of 30 pounds. Rather, he believes that the brain swelling was the result of hypoxia, which was very long in this case. The police had been dispatched at 4:36 p.m., as the result of a 911 hang-up call and arrived approximately three to five minutes later. The paramedics waited until the police officers indicated the scene was safe before entering, per normal procedure. It took 12 minutes from the dispatch until the paramedics began working on Jayden. The epinephrine that was administered to start Jayden's heart requires three minutes to elapse between doses, and Jayden received six doses before his heart responded. Jayden's heart also stopped again during the Medflight.
 {¶ 17} On cross-examination, Dr. Plunkett admitted that his opinion is contrary to what has been taught in medical schools since 1972, is contrary to the views of the American Pediatric Academy and that an overwhelming majority of pediatricians disagree with his opinion.
 {¶ 18} The assignments of error are related and shall be addressed together. By the first assignment of error, appellant contends that the judgment of conviction is not supported by sufficient evidence and, by the second assignment of error, appellant contends that the verdict is against the manifest weight of the evidence.
 {¶ 19} The standard of review for sufficiency of the evidence is if, while viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. "In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law." State v. Thompkins (1997), 78 Ohio St.3d 380,386.
 {¶ 20} The test for determining whether a conviction is against the manifest weight of the evidence differs somewhat from the test as to whether there is sufficient evidence to support the conviction. With respect to manifest weight, the evidence is not construed most strongly in favor of the prosecution, but the court engages in a limited weighing of the evidence to determine whether there is sufficient competent, credible evidence which could convince a reasonable trier of fact of appellant's guilt beyond a reasonable doubt. See State v. Conley (1993), Franklin App. No. 93AP-387.
* * * Weight of the evidence concerns "the inclination of thegreater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credibleevidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on itseffect in inducing belief." (Emphasis added.) Black's [Law Dictionary (6th Ed. 1990)] at 1594). Thompkins, at 387.
 {¶ 21} The three physicians, who had examined or treated Jayden, and the coroner testified that Jayden died as a result of a non-accidental and immediately incapacitating injury, which resulted in the constellation of injuries comprising shaken baby syndrome. First, Dr. Johnson testified concerning the injuries that one would generally expect to find in a child that had experienced shaken baby syndrome, including subdural, not epidural, bleeding, no external injuries except rarely rib fractures or unusual fracture of the legs, retinal hemorrhages in 85 percent of the cases and bleeding in the sheath of the nerves from the eyes to the skull, which can be seen only during an autopsy. In Jayden, the injuries included edema, optic nerve hemorrhages, or constellation of subdural hemorrhages and retinal hemorrhages. Dr. Johnson discounted the possibility that falls the previous week or on February 13 as the cause of death.
 {¶ 22} Dr. Groner, Jayden's treating pediatric surgeon at Children's Hospital, testified that Jayden's injuries to his brain, as seen on his CT scan, and injuries to his eyes are not consistent with a fall from standing height. He believed Jayden's injuries would have been immediately incapacitating. He also stated that several falls in the week before Jayden's death would not have caused the optic nerve hemorrhages or the retinal hemorrhages.
 {¶ 23} The attending physician at Children's Hospital, Dr. Hauersperger, also stated that the head CT scan showed that there was blood collection around the surface of the brain and into the different folds of the brain, and diffused cerebral edema. Jayden also had retinal hemorrhages to both eyes. The paramedics' report listed the history as Jayden had slipped and fallen, but Dr. Hauersperger opined that history and the degree of injury were incompatible. Her conclusion was that Jayden sustained a non-accidental head injury, most consistent with shaken baby syndrome, and the injury would have been immediately incapacitating.
 {¶ 24} The coroner testified that Jayden's injuries included hemorrhage in the sheath around both optic nerves and hemorrhage into his retina in the left eye. The coroner opined that it was highly unlikely that his injuries could have been caused by a fall because there was no point of impact where he hit his head, and, to cause such injuries by a fall, the fall had to have been from a height greater than five to ten feet. The coroner believed that the injuries lead to the conclusion that the cause was shaken baby or shaken impact syndrome. The information about prior falls by Jayden did not alter the coroner's opinion regarding the cause of the injuries because there was no evidence of any significant head trauma from prior falls.
 {¶ 25} Jayden had the three injuries which comprise the typical shaken baby syndrome injuries, including subdural hemorrhage, retinal hemorrhage and optic nerve hemorrhage. All of these doctors testified that, knowing of Jayden's previous falls, including one in the bathtub, did not change their opinion and conclusion that Jayden died as a result of shaken baby syndrome. They testified that the injuries would be immediately incapacitating.
 {¶ 26} Although appellant's expert testified that there is a scientific invalidity with the concept of shaken baby syndrome because one does not cause injuries usually associated with shaken baby syndrome by shaking a child, he admitted that his opinion is contrary to what has been taught in medical schools since 1972, is contrary to the views of the American Pediatric Academy and that an overwhelming majority of pediatricians disagree with his opinion, including the ones that testified for the prosecution.
 {¶ 27} Dr. Plunkett testified that Jayden's brain swelling was the result of hypoxia and that the CT scan strongly suggests that the brain swelling started 12 to 24 hours or more prior to Jayden's admission to the hospital. He believes Jayden's cause of death was brain swelling, probably due to impact injury and may have been complicated by pneumonia, not the result of shaken baby syndrome because appellant would need to generate 2,400 pounds of force to cause such injuries since Jayden weighed 30 pounds.
 {¶ 28} The existence of conflicting evidence does not render the evidence insufficient as a matter of law. State v. Murphy
(2001), 91 Ohio St.3d 516, 543. Similarly, a conviction is not against the manifest weight of the evidence solely because the jury heard inconsistent testimony. State v. Kendall (June 29, 2001), Franklin App. No. 00AP-1098. The trier of fact makes determinations of credibility and the weight to be given to the evidence. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 29} It is not unusual that evidence of shaken baby syndrome may be primarily circumstantial, especially where a child is in the sole custody of one adult at the time the injuries are sustained. See State v. Gulertekin (Dec. 3, 1998), Franklin App. No. 97APA12-1607, in which this court found sufficient circumstantial evidence to support a conviction of child endangering where an infant suffered injuries consistent with shaken baby syndrome while entrusted to the defendant's care. While appellant presented a credible defense, in this case, when viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. There is sufficient competent, credible evidence which could convince a reasonable trier of fact of appellant's guilt beyond a reasonable doubt. The judgment of conviction is supported by sufficient evidence and the verdict is not against the manifest weight of the evidence. Both of appellant's assignments of error are not well-taken.
 {¶ 30} For the foregoing reasons, appellant's two assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
Bryant and Petree, JJ., concur.