JOURNAL ENTRY AND OPINION
{¶ 1} Appellant-Defendant Scott Woodson ("Appellant") appeals from his convictions for attempted murder and felonious assault. For the reasons set forth below, we affirm.
 {¶ 2} On December 3, 2003, the Appellant was indicted following events which occurred when he took his son, Troy Woodson, to Southwest General Hospital where Troy was diagnosed with an inflicted head injury. Soon thereafter, Troy was life-flighted to Rainbow Babies and Children's Hospital and underwent surgery to his brain for an acute subdural hematoma, as well as a chronic subdural hematoma.
 {¶ 3} As a result of this incident, Appellant was indicted on five counts: one count for attempted murder, in violation of R.C. 2923.02/2903.02; one count of felonious assault, in violation of R.C. 2903.11; one count of endangering children in violation of R.C. 2919.22; and two counts of endangering children in violation of R.C. 2919.22. The Appellant pled not guilty to the charges.
 {¶ 4} On March 18, 2004, the trial court granted the state's motion to consolidate for trial the case pending against Scott Woodson with case no. CR-448644, State of Ohio v. Jennifer Veselsky.
 {¶ 5} On October 18, 2004, Appellant executed a jury waiver form and the trial judge proceeded to trial. During the trial of this matter, the court heard the testimony of fifteen witnesses: Harris Freed, M.D., Kristin Froelich, Brett Ulrich, Tiffany Hammond, Angelina Hamilton, Amy R. Jeffrey, M.D., Karim Lopez, M.D., Lolita McDavid, M.D., Marty Compton, Angel Ronda, D.O., George Kirschling, Alan Cohen, M.D., Carmen Hansford, M.D., Edwin Biglang-Awa, and the Appellant.
 {¶ 6} Harris Freed, M.D., a radiologist at Southwest General Health Center ("Southwest"), testified that he interpreted the CT scans performed on Troy Woodson ("Troy"), the Appellant's and Jennifer Veselsky's ("Veselsky") five-month-old son. From these scans, Dr. Freed was able to observe an acute, subacute and chronic bleeding and clotting in Troy's brain. He defined an acute bleeding as a bleed in the brain that is one to two days old. He defined a subacute bleeding as a bleed in the brain that is three to five days old. He also defined a chronic bleeding as a bleed in the brain that is more than seven days old. Based upon his interpretation of the CT scans and the three separate bleedings, Dr. Freed diagnosed Troy to a reasonable degree of medical certainty with shaken baby syndrome. Dr. Freed explained that significant trauma to the brain ripped the blood vessels from the surface and caused the bleeding found in this case. He further testified that, to a reasonable degree of medical certainty, Troy's injuries to his brain were not a re-bleed of an old injury but were separate and repeated incidents of trauma.
 {¶ 7} Next, Kristin Froelich, the Appellant's neighbor, testified that on more than one occasion she witnessed the Appellant failing to attend to Troy while he was crying. She recalled two instances when she heard Troy crying while the Appellant continued doing yard work without attending to the child. She also recalled an occasion when she heard Troy crying for forty minutes to an hour with no reprieve, as well as an incident in which the Appellant maintained a conversation with her while Troy cried.
 {¶ 8} Brett Ulrich ("Ulrich"), a registered nurse at Southwest, testified that he attended to Troy on September 5, 2003 in the trauma room. He described Troy's head as stiff and postured to the left. His breathing also seemed irregular and he was having seizure-like activity. Troy's eyes were shut and he was unresponsive. Additionally, his left eye was fixed laterally, as well as dilated to twice the size of the right. These symptoms indicated neurological problems. Therefore, Ulrich ordered a CT scan.
 {¶ 9} Additionally, Ulrich took a history of Troy from the Appellant. The Appellant stated he had been giving Troy a decongestant for about one week and that Troy did not suffer any type of fall or trauma. Appellant also told Ulrich that Troy was difficult to awake approximately one week earlier. Veselsky told Ulrich she had been at work all day and the Appellant had cared for Troy. Veselsky also confirmed that Troy did not suffer any fall or trauma.
 {¶ 10} The next person to testify on behalf of the state was Tiffany Hammond, a social worker for the Cuyahoga County Department of Children and Family Services. She testified that on September 5, 2003, she received a telephone call regarding Troy. Ms. Hammond stated that she was familiar with the Appellant and Veselsky as she had previously worked with the family in 1999 in connection with their daughter, Taylor Woodson. She explained that in 1999, Taylor Woodson was three or four months old and had severe multiple injuries suspicious of physical abuse and shaken baby syndrome.
 {¶ 11} Angelina Hamilton, also a social worker for the Cuyahoga County Department of Children and Family Services, was assigned to the case of Troy on September 8, 2003. Ms. Hamilton testified that she attended a meeting with Veselsky regarding Troy, as well as her and the Appellant's daughter, Taylor. During that meeting, Veselsky blamed the Cleveland Clinic for Taylor's injuries in 1999. Veselsky further stated that in 1999 she told Children and Family Services she thought Appellant was responsible for Taylor's injuries because she would say anything to get her child back.
 {¶ 12} Ms. Hamilton also testified that she reviewed the records of the incident with Taylor in 1999. As a result of that incident, Taylor was taken into the custody of Children and Family Services and was adjudicated abused. Additionally, the Appellant was prosecuted for the injuries to Taylor and eventually incarcerated. Also, Juvenile Court issued an order when Taylor was returned to Veselsky stating that when Appellant was released from jail, he was to attend and complete parenting classes, anger management classes, counseling, individual counseling, and then petition the court to have supervised visits with Taylor.
 {¶ 13} In regards to Troy, Hamilton testified that Veselsky stated she worked from 8:30 a.m. to 3:30 p.m. on September 5, 2003 and left both children to the care of the Appellant during that time. When she returned home, Troy was unresponsive. Therefore, Veselsky and the Appellant transported Troy to Southwest.
 {¶ 14} Amy R. Jeffrey, M.D., a pediatric opthamologist at Rainbow Babies and Children's Hospital ("Rainbow Babies"), testified that she examined Troy and observed retinal hemorrhaging in his left eye. She opined to a reasonable degree of medical certainty that the ocular injuries were consistent with shaken baby syndrome, not accidental trauma.
 {¶ 15} Karim Lopez, M.D., Troy's primary care physician since birth, testified that prior to September, 2003, Troy had no apparent medical problems and had been administered the standard and recommended immunizations without any adverse reactions. Dr. Lopez further testified that on August 30, 2003, he received a phone call from one of the parents of Troy who stated that he would not wake up or open his eyes. Dr. Lopez instructed the parent to phone 911. On September 2, 2003, Troy was taken to the office of Dr. Lopez with a runny nose, cough and concern for a fever. Dr. Lopez prescribed rest, fluids, a cough decongestant and Motrin.
 {¶ 16} Lolita McDavid, M.D., medical director of Child Advocacy and Protection at Rainbow Babies, testified that she examined the medical records and concluded, to a reasonable degree of medical certainty that Troy's injuries were inflicted, not accidental, and consistent with shaking.
 {¶ 17} Detective Marty Compton testified he is employed by the Parma Police Department and investigated the injuries sustained by Taylor Woodson in March, 1999. Taylor had retinal hemorrhaging as a result of shaken baby syndrome. She had multiple fractures, sustained at different times, which included a distal right femoral fracture, a skull fracture, and rib fractures. She also suffered a subdural hematoma. The constellation of skeletal abnormalities was pathogenomic of non-accidental trauma or child abuse.
 {¶ 18} Additionally, Detective Compton testified that he interviewed Taylor's parents, Veselsky and the Appellant. Veselsky stated she returned to work three weeks prior to Taylor's injuries and Appellant was caring for Taylor. The Appellant plead guilty to two counts of attempted child endangering, felonies of the fourth degree.
 {¶ 19} Dr. Angel Ronda, the Southwest emergency room doctor that attended to Troy, described Troy as being stiff and unresponsive. He testified that Troy's eyes were not moving in normal coordination which indicated to Dr. Ronda that severe intra cranial injury was present. Dr. Ronda questioned Appellant who described Troy as being unresponsive for one hour that day and described a similar occurrence about one week earlier. Based upon the results of the CT scan, Dr. Ronda discovered that Troy suffered from a large subdural hematoma. Dr. Ronda did not observe any obvious trauma to any part of the child's body. Based upon Troy's injuries, Dr. Ronda suspected shaken baby syndrome. He administered an anti-seizure medication and arranged for Troy to be life flighted to Rainbow Babies.
 {¶ 20} George Kirschling, a registered nurse at Southwest, testified that it was obvious to him that Troy required immediate medical attention. He further testified that the Appellant informed him that Troy had been sleeping frequently and was difficult to awaken. Appellant also informed Kirschling that Troy's breathing was also altered and he had received cold medication that day.
 {¶ 21} Alan Cohen, M.D. treated Troy at Rainbow Babies on September 5, 2003. He is chief surgeon at Rainbow Babies and chief of pediatric neurosurgery and pediatrics at Case Western Reserve University School of Medicine. Dr. Cohen testified that he performed surgery in order to relieve the pressure being placed on the brain by the subdural hematoma. He observed a blood clot that was acute, which most likely happened within a few hours, and a chronic subdural hematoma that had been there for perhaps weeks. Dr. Cohen testified to a reasonable degree of medical certainty that Troy's injuries were caused by an inflicted head injury.
 {¶ 22} Dr. Carmen Hansford testified that she has been Troy's primary physician since his injury. She testified that Troy appears to be a slow walker and his speech is slightly delayed.
 {¶ 23} Detective Biglang-Awa testified that he is employed by the Brookpark Police Department and investigated the incidents with Troy. He photographed Troy at Rainbow Babies and obtained his medical records. He further testified that he reviewed service logs for the police and fire department and verified that there were no 911 phone calls from the Woodson home on August 30, 2003.
 {¶ 24} At the conclusion of Detective Biglang-Awa's testimony, the state rested its case, pending the admission of its exhibits. Appellant then made a Crim.R. 29 motion, which the court denied.
 {¶ 25} The Appellant then took the witness stand on his own behalf. The Appellant testified that he had a child with Veselsky named Taylor on December 26, 1998. In 1999 he was convicted of crimes against Taylor and incarcerated.
 {¶ 26} Additionally, Appellant testified he was the father of Troy, who was born on April 18, 2003. About one week before September 5, 2003, Appellant testified he put Troy down for a nap and later found Troy face down in the corner with his arms tucked underneath his chest and his legs thrusting out. Troy would not open his eyes. Therefore, Veselsky contacted Dr. Lopez's office. During the conversation, however, Troy started to cry and opened his eyes. Veselsky and the Appellant began to drive to Southwest on this occasion but turned around after deciding Troy was fine.
 {¶ 27} Appellant admitted under oath that on September 5, 2003 he was home alone with the children all day. In the afternoon, Appellant found Troy in his crib unresponsive and when Appellant picked up Troy, he was limp from the torso up, his legs were rigid. Also, his eyes rolled into the top of his head. Soon thereafter, around 3:00 or 3:30 p.m. Veselsky arrived home from work and the two drove Troy to Southwest.
 {¶ 28} On cross-examination, Appellant admitted he was the sole caregiver of Troy Woodson in the days following the Appellant's knee surgery while Veselsky was at work. During this time, Veselsky was away from the home approximately 8:30 a.m. to 6:00 or 6:30 p.m. on Mondays thru Thursdays and 9:00 a.m. to 3:00 or 3:30 p.m. on Fridays.
 {¶ 29} Appellant further admitted that in 1999 he was required to do research on "shaken baby syndrome." The state submitted Appellant's report of his research into evidence as State's Exhibit 41 at the trial of this matter and the Appellant read into the record the contents of that report.
 {¶ 30} After the Appellant's testimony, the defense rested and moved for another Rule 29 motion, which the trial court denied.
 {¶ 31} On October 18, 2004, after hearing all the evidence and testimony, the trial court found the Appellant guilty of attempted murder, felonious assault, and three counts of endangering children. The court referred the Appellant to the County Probation Department for a presentence investigation and report.
 {¶ 32} On December 7, 2004, the court sentenced the Appellant to a prison sentence of ten years on count one, eight years on count two and five years on counts three, four and five. The sentences in counts one and two were to run concurrent. The court found that counts three, four and five were allied offenses of similar import and therefore merged. The sentences to counts three, four and five were to run concurrent to the terms imposed in counts one and two. Additionally, the court imposed a fine of $10,000 and ordered Post Release Control.
 {¶ 33} Appellant now appeals and submits one assignment of error for our review.
 {¶ 34} Appellant's sole assignment of error states:
 {¶ 35} "The trial court erred in denying the Defendant-Appellant's Motions for Judgment of Acquittal pursuant to Rule 29(A) Ohio Rules of Criminal Procedure with respect to the counts of the indictment charging the offenses of attempted murder and felonious assault."
 {¶ 36} Crim.R. 29(A) governs motions for acquittal and provides for a judgment of acquittal if the evidence is insufficient to sustain a conviction. Pursuant to Crim.R. 29, a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt. A Crim.R. 29(A) motion for acquittal "should be granted only where reasonable minds could not fail to find reasonable doubt." State v. Apanovitch (1987),33 Ohio St.3d 19, 23, 514 N.E.2d 394; State v. Jordan, Cuyahoga App. Nos. 79469 and 79470, 2002-Ohio-590.
 {¶ 37} The standard for a Rule 29 motion is virtually identical to that employed in testing the sufficiency of the evidence. State v.Turner, Franklin App. No. 04AP-364, 2004-Ohio-6609, citing State v.Thompkins, 78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541. An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.Thompkins, supra at 390. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Id.
 {¶ 38} In the instant action, the Appellant was charged and convicted of attempted murder. R.C. 2903.02 and R.C. 2923.02 state in pertinent part as follows:
 {¶ 39} "§ 2903.02. Murder.
 {¶ 40} "(B) No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code."
 {¶ 41} "§ 2923.02. Attempt.
 {¶ 42} "(A) No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense."
 {¶ 43} The Appellant was also charged and convicted of felonious assault. Felonious assault is defined in R.C. 2903.11 as follows:
 {¶ 44} "(A) No person shall knowingly * * *
 {¶ 45} "(1) Cause serious physical harm to another or to another's unborn; * * *"
 {¶ 46} "Knowingly" is defined in R.C. 2901.22 as follows:
 {¶ 47} "(B) A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."
 {¶ 48} The record demonstrates that the state presented a number of experts and treating physicians, who diagnosed Troy to a reasonable degree of medical certainty with an inflicted head trauma or shaken baby syndrome. Dr. Harris Freed diagnosed Troy with shaken baby syndrome based upon the fact that Troy suffered from a subdural hematoma, brain edema, the fact that there was blood at different phases and different stages, which indicated repeated trauma. Dr. Amy Jeffrey opined that Troy's oscular injuries were the result of shaken baby syndrome, not accidental trauma. Dr. Lolita McDavid opined the cause of Troy's injuries as an inflicted head injury consistent with shaking. Finally, Dr. Alan Cohen testified that Troy suffered from an inflicted head injury. In light of the abundant testimony and evidence offered by these doctors, we find that there was sufficient evidence to establish that Troy suffered from an inflicted head trauma or shaken baby syndrome.
 {¶ 49} Appellant, however, maintains that shaken baby syndrome is not a medically accepted injury. Like the trial court, we find that the medical expert testimony sufficiently establishes the contrary. Dr. Jeffrey testified that retinal hemorrhaging, as a result of shaken baby syndrome, is a well accepted theory in the peer-reviewed medical community. Dr. Cohen testified that while there are disagreements over the specifics of shaken baby syndrome, in terms of the overall mechanism of the syndrome, there is no disagreement among the mainstream of neurologic surgeons that there is a very real problem of inflicted head injuries to infants. Furthermore, case law establishes that shaken baby syndrome is within the medically accepted literature and testimony that has ensued in courtrooms in this state, as well as nationwide. See Statev. Butts, Franklin App. No. 03AP-495, 2004-Ohio-1136; State v. Munici
(Nov. 19, 1987), Cuyahoga App. No. 52579. See, also, United States v.Brown (C.A.8, 2003), 360 F.3d 828; State v. Richthofein (La.App. 2001),803 So.2d 171; Terrell v. State (2000), 342 Ark. 208, 27 S.W.3d 423;Drake v. State (2000), 272 Ga. 797, 537 S.E.2d 336; State v. Smith
(Ariz.App. 1996), 188 Ariz. 263, 935 P.2d 841; State v. McClary (1988),207 Conn. 233, 541 A.2d 96.
 {¶ 50} Appellant also maintains that the subdural hematoma was a rebleed of a pre-existing injury. Again, we find Appellant's argument lacks merit. As stated previously, Dr. Harris testified to a reasonable degree of medical certainty that Troy's injuries were inflicted head injuries, not rebleeds. Dr. Cohen testified that a rebleed of a chronic subdural hematoma without trauma is extremely unlikely and he had never seen it occur.
 {¶ 51} Appellant has also alleged that the State has not produced any evidence that he was the perpetrator of the crimes against his son. We disagree. As the State has argued and the record clearly shows, Appellant was the sole caretaker for Troy at the time he received the injuries to his head. Appellant, himself, testified that he was the primary caretaker on September 5, 2003 as Veselsky was at work on that day from early in the morning to approximately 3:00 or 3:30 p.m. Accordingly, Appellant's argument that the trial court was not presented with evidence that he was the perpetrator is without merit.
 {¶ 52} Appellant further contends that the case against him is circumstantial. However, "circumstantial evidence and direct evidence inherently possess the same probative value." State v. Brooks (Sept. 25, 2001), Franklin App. No. 00AP-1440, citing State v. Gulertekin (Dec. 3, 1998), Franklin App. No. 97APA12-1607. In Brooks, the court held the following:
 {¶ 53} "Moreover, it is not unusual that evidence of shaken baby syndrome may be primarily circumstantial, especially where a child is in the sole custody of one adult at the time the injuries are sustained. SeeGulertekin, supra (sufficient circumstantial evidence to support conviction of child endangering where an infant suffered injuries consistent with shaken baby syndrome while entrusted to the defendant's care); State v. Williams, (1992) Ohio App. LEXIS 1010 (Mar. 5, 1992), Franklin App. No. 91AP-653, unreported (sufficient circumstantial evidence to support conviction of child endangering where there was medical expert testimony that an infant was injured as the result of abuse and where the defendant was the primary caretaker of the infant immediately proceeding the manifestation of the infant's injuries); Statev. Kirk, (1994) Ohio App. LEXIS 1189 (Mar. 24, 1994), Franklin App. No. 93AP-726, unreported; State v. Banks, (1993) Ohio App. LEXIS 2827 (June 3, 1993), Franklin App. No. 92AP-859, unreported; State v. Wright
(1986), 31 Ohio App.3d 232, 510 N.E.2d 827. See, also, State v.Munici, (1987) Ohio App. LEXIS 9683 (Nov. 19, 1987), Cuyahoga App. No. 52579, unreported."
 {¶ 54} In light of the abundant testimony and evidence offered at trial, we cannot conclude that the convictions are not supported by sufficient evidence. At trial, the state offered the testimony of five doctors, each testifying to a reasonable degree of medical certainty that Troy's injuries were the result of an inflicted head injury or shaken baby syndrome and not a rebleed of an existing injury. Moreover, the court rationally inferred that the Appellant, as the sole care giver at the time Troy became symptomatic, was the person responsible for inflicting the injuries to Troy's head. Finally, the state presented sufficient evidence to establish that the Appellant acted purposely and knowingly when he injured his son. The state presented evidence of Appellant's previous conviction for child endangerment and a report written by the Appellant researching shaken baby syndrome, the effects, and the alternatives to caring for a crying baby. Accordingly, in viewing the evidence in a light most favorable to the prosecution, sufficient evidence existed for the court to conclude beyond a reasonable doubt that the Appellant was guilty of the attempted murder and felonious assault. Therefore, Appellant's sole assignment of error is without merit.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Kilbane, J., and Corrigan, J., Concur.