192 P.3d 1088

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Miguel Ortiz MORALES, Defendant–Appellant.**

**No. 33547.**

Court of Appeals of Idaho.

June 2, 2008.

Review Denied Sept. 26, 2008.

Molly J. Huskey, State Appellate Public Defender; Eric D. Fredericksen, Deputy Appellate Public Defender, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Daniel W. Bower, Deputy Attorney General, Boise, for respondent.

SCHWARTZMAN, Judge Pro Tem.

Miguel Ortiz Morales appeals from his judgment of conviction for felony injury to a child. Specifically, Morales asserts that there was insufficient evidence produced at trial on the element of whether the victim was in his "care or custody," and whether he "willfully permitted" the victim to be placed in such situation that its person or health was endangered. For the reasons set forth below, we affirm.

## I.

### FACTS AND PROCEDURE

In July 2005, officers questioned Morales at the hospital regarding injuries that his nephew, E.H., had suffered. E.H., a twenty-one-month-old child, was eventually transported from the Twin Falls area to Boise by life-flight where he was treated for significant injuries, which included acute subdural hematoma, retinal hemorrhaging in both eyes, bruises, fractures, and abrasions.

E.H. and his mother, Patricia, Morales's sister from Mexico, had been living with Morales, his wife[1], and their children for over three months prior to the July injuries. Morales helped Patricia get a job and a car, and he provided transportation for her. Patricia would watch Morales's children while he and his wife were at work, and Morales and his wife would watch E.H. while Patricia was at work.

---

**1.** In actuality, the woman referred to as Morales's wife is not his legal wife. However, Morales considered her to be his wife because they have three children together and he had lived with her for approximately eight years, even though he was still legally married to another woman, Rhiannon Nino. Therefore, we will refer to this woman as Morales's wife.

In addition to taking E.H. to the hospital in July, Morales had also taken E.H. for treatment of a broken arm in April and a head injury in May. In April, Morales and his wife took E.H. to the hospital for treatment of his broken arm and identified themselves under the assumed name of "Nino." Morales and his wife also informed the hospital officials that E.H. was their son, Edgar Nino.[2]

Morales, his wife, and Patricia told officers that all three of the hospital visits were the result of accidents and that E.H. was a very active baby. However, the emergency room doctor who treated E.H. in Twin Falls in July before deciding to send him to a Boise hospital by life-flight, testified that E.H. had hematomas on his head; a scar on his chin; bleeding in his eyes; scratches on various parts on his body; bruising on his groin, back, and arm; a fractured clavicle and arm; fractures, new and old, to the back of the head; and extensive bruising on his abdomen. Additionally, the doctor testified that a CT scan of E.H. revealed blood compressing on his brain from an acute subdural hematoma, ventricles in the brain filled with cervical spinal fluid, and a previous brain injury, contributing to E.H.'s brain damage. The doctor concluded:

> I knew that the child had been battered when I saw him. He—he was bruised. He had a severe brain injury. The more I looked, the more atypical bruising that I found. There was no doubt in my mind that this child had been the victim of a battery, that these were nonaccidental injuries.

Although medical professionals believed that E.H.'s injuries were the result of abuse and could not have occurred accidentally, the state was unable to determine who actually abused E.H. Consequently, Morales, his wife, and Patricia were all charged with injury to a child by willfully permitting E.H. to be placed in a dangerous situation.[3] Morales was found guilty of felony injury to child. I.C. § 18–1501. He appeals.

## II.

## ANALYSIS

Morales argues that there was insufficient evidence to show that E.H. was in his "care or custody," and also that there was insufficient evidence to show that he "willfully permitted" E.H. to be placed in a situation where his health was endangered. The pertinent part of the injury to child statute provides that "any person who, under circumstances or conditions likely to produce great bodily harm or death, ... having the care or custody of any child, ... willfully causes or permits such child to be placed in such situation that its person or health is endangered" is guilty of a felony. I.C. § 18–1501(1).

Appellate review of the sufficiency of the evidence is limited in scope. A finding of guilt will not be overturned on appeal where there is substantial evidence upon which a reasonable trier of fact could have found that the prosecution sustained its burden of proving the essential elements of a crime beyond a reasonable doubt. *State v. Herrera–Brito*, 131 Idaho 383, 385, 957 P.2d 1099, 1101 (Ct. App.1998); *State v. Knutson*, 121 Idaho 101, 104, 822 P.2d 998, 1001 (Ct.App.1991). We will not substitute our view for that of the trier of fact as to the credibility of the witnesses, the weight to be given to the testimony, and the reasonable inferences to be drawn from the evidence. *Knutson*, 121 Idaho at 104, 822 P.2d at 1001; *State v. Decker*, 108 Idaho 683, 684, 701 P.2d 303, 304 (Ct. App.1985). Moreover, we will consider the evidence in the light most favorable to the prosecution. *Herrera–Brito*, 131 Idaho at 385, 957 P.2d at 1101; *Knutson*, 121 Idaho at 104, 822 P.2d at 1001.

### A. Care or Custody

■ The injury to child statute does not define "care or custody." Furthermore, Idaho case law has not defined these terms as

---

**2.** Morales indicated this was done because Rhiannon Nino had medicare and it would cover the costs of E.H.'s treatment.

**3.** Patricia pled guilty to misdemeanor injury to a child. Morales and his wife were tried jointly and both found guilty of felony injury to a child, but this opinion only addresses an appeal by Morales.

they relate to the elements of the statute proscribing injury to child. In the absence of a statutory definition, we look to the ordinary meaning of the word and the context in which it is used. *State v. Martinez*, 122 Idaho 158, 161, 832 P.2d 331, 334 (Ct.App. 1992). "Care" is defined as "CHARGE, SUPERVISION, MANAGEMENT: responsibility for or attention to safety and well-being." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 338 (1993). *See also People v. Culuko*, 78 Cal.App.4th 307, 92 Cal.Rptr.2d 789, 808 (2000) (holding that there is " 'no special meaning to the terms "care and custody" beyond the plain meaning of the terms themselves. The terms "care or custody" do not imply a familial relationship but only a willingness to assume duties correspondent to the role of a caregiver.' " (quoting *People v. Cochran*, 62 Cal.App.4th 826, 73 Cal. Rptr.2d 257, 261 (1998))); *State v. Jones*, 188 Ariz. 388, 937 P.2d 310, 314 (1997) (employing the same dictionary definition quoted above and concluding that "both 'custody' and 'care,' as they relate to A.R.S. § 13–3623, imply accepting responsibility for a child in some manner").

In this case, E.H. and Patricia lived with Morales in his home rent-free for over three months. An officer testified that Morales admitted to watching the children, stating that he would "get up and irrigate, come back and check on them about ten.... And on some of the weekends that he was off, he would take care of the kids while ... the adults were gone." Morales's wife told the officer that, in addition to herself and Patricia, "sometimes [Morales] watched [E.H.]." Patricia also testified that Morales had watched E.H. on occasion.

A review of the record reveals that all three times E.H. was injured it was Morales who took him to the hospital. The officer testified that Morales told him that he had iced E.H.'s arm after the first accident and before taking him to the hospital. Morales also admitted to helping Patricia remove E.H.'s cast before taking him to the hospital after the second accident. The officer further testified that Morales admitted that he was babysitting E.H. with his wife when E.H. vomited and went limp, approximately two to three days after the third injury. Morales did not immediately take E.H. to the emergency room, but waited until Patricia returned from work to seek medical attention for E.H. In addition, Morales told a detective about "Estomaquil," a remedy for children with upset stomachs that Morales had purchased in Mexico. Morales provided the detective with the "Estomaquil" and described the process of massaging the child's stomach after he had consumed the medicine.

Morales freely acknowledged that he tried to do what was necessary to protect E.H. while he was living in his home, especially after the first head injury, and that he wanted to provide for the child even if he had to pay for it himself. The record shows that there was substantial evidence upon which a jury could conclude that Morales, on a recurring basis, regularly assumed, shared, and discharged joint responsibility for the care, custody, and well-being of E.H. while his nephew was living in this communal family situation.

### B. Willfully Permitted

█ Morales also argues that there was insufficient evidence to prove that he "willfully permitted" E.H. to be placed in a situation where his health was endangered as there was no evidence that Morales was present during any of the incidents where E.H. was injured, nor was there any evidence that Morales failed to act once he had knowledge of a medical emergency. The state counters by arguing that there was substantial evidence showing that Morales allowed E.H. to be placed in the harmful situation that led to E.H.'s abuse, a situation that Morales knew existed.

█ The willfulness element of the endangerment clause from I.C. § 18–1501 requires that the person providing care or custody of the child willfully endanger the child by subjecting the child to a known risk of harm. *State v. Halbesleben*, 139 Idaho 165, 170, 75 P.3d 219, 224 (Ct.App.2003). This does not require that the defendant intended to harm the child, but it does require that the defendant placed the child in a potentially harmful situation with knowledge of the danger. *Id.*

Although not determinative in this case, we note that, contrary to Morales's assertion, there was testimony indicating that he was present during one of the incidents when E.H. was injured. The detective who interviewed Morales testified that Morales told her that he "had seen the glass table fall on [E.H.] in April." Furthermore, Morales's contention that there was no evidence that he failed to act once he had knowledge of a medical emergency is unpersuasive. Morales was not charged under the portion of the statute proscribing failure to render aid. Instead, the jury was instructed and the state argued that Morales was guilty of felony injury to child because he permitted E.H. to be placed in a situation where E.H.'s health was endangered and Morales knew that the situation posed a risk of danger to E.H.'s person or health.

Morales's sister pled guilty to misdemeanor injury to child before his trial, and she testified at the request of the state. She maintained that she did not injure E.H. and was not present when E.H. was injured, but thought all of E.H.'s injuries were accidental. Both Morales and his wife testified that they also thought all of E.H.'s injuries were accidental. However, the emergency room doctor who initially treated E.H. after the July injury testified that he knew the child had been battered and was certain that the injuries were non-accidental. As a result of these cumulative injuries, E.H. will walk with a permanent limp, be developmentally delayed, and have impaired vision for the rest of his life.

The detective who interviewed Morales regarding E.H.'s injuries also testified about the conversation she had with Morales:

Q. Did you talk with him about what his responsibilities would have been for that child to be in his home and getting hurt?

A. Yes.

Q. What was his response to that?

A. I said to him, "But you live in that home, you know the child was being hurt, someone was hurting him, and you allowed it to happen; right?"

And he, he said, "Yes, I, I guess I did. I knew something was wrong, and, and I didn't do anything, and I didn't stop it."

On cross-examination, Morales testified as follows regarding E.H.'s injuries:

Q. Okay. Now, you had some questions yourself about how this, these injuries kept happening to [E.H.], didn't you?

A. Yes. So now I got few questions to myself, and I ask and I want to know what's going on to my nephew.

Q. Okay. And you knew something was up, but you couldn't get your arms around it, is what your attorney said; is that right?

A. Yes.

Q. You saw the bruises on [E.H.'s] forehead days before he went to the hospital; isn't that right?

A. Right.

Q. And there was a bruise in the middle?

A. Right, that's correct.

The testimony from the detective and medical personnel, Morales's admissions and the periodic reoccurring visits to the hospital followed by E.H.'s return to the exact same conditions, coupled with the increasing severity and devastating effect of E.H.'s injuries, when viewed in the light most favorable to the state, provide substantial evidence that Morales willfully permitted E.H. to be placed in a situation where his health was endangered and that Morales knew of the danger.

## III.

## CONCLUSION

The term "care or custody" from I.C. § 18–1501(1) should be given its ordinary meaning. Furthermore, we conclude that there was substantial evidence upon which a reasonable trier of fact could have found that E.H. was in Morales's care and that Morales willfully permitted E.H. to be placed in a situation where E.H.'s health was endangered and that Morales knew of the danger. Therefore, Morales's judgment of conviction for felony injury to a child is affirmed.

Judge LANSING, concurs.

Chief Judge GUTIERREZ specially concurring.

I specially concur to elaborate on the "care or custody" issue decided herein and also to shed some light on how the issue was considered by the jurors, the lawyers and the trial court. Also, I believe it is important to understand Idaho's position in defining "care or custody" in contrast with other jurisdictions that have interpreted the term under similar criminal statutes.

In reviewing the 1020 page transcript, it is apparent that the bulk of the evidence presented focused upon the other elements of the injury to a child statute and not upon the "care or custody" element. Suffice it to say that the individual testimony of the witnesses on this element reflects mostly an incidental or generalized reference to establishing this element.

In closing argument to the jury, the state outlined the evidence establishing that Morales had "care" of E.H. It pointed to the fact that Morales helped E.H. come to America and the fact that Morales lived with E.H. Additionally, the state brought out the fact that sometimes Morales cared for E.H. while E.H.'s mother was at work, that Morales drove E.H. around, that Morales checked on E.H. during the work day, and that Morales drove the child to the hospital and to see a specialist. Lastly, the state pointed out that Morales posed as E.H.'s father.

Remarkably, Morales's counsel did not address the "care or custody" element in his closing argument to the jury.

Erendira's defense counsel asked the jury to find that Erendira did not have E.H. in her "care or custody." [1] The state, in rebuttal closing argument, requested the jury find that E.H. was in Erendira's "care" by applying the definition of "care" to be, "provision of what's necessary for the welfare and protection of someone or something, look after and provide the needs for." Morales's counsel objected on the grounds that the state was implying the state's enumeration of "care" was the legal definition. The district court overruled the objection.

The jury was handed the case for deliberation on Friday, August 18, 2005, around 5:50 p.m. Approximately one and one-half hours later, the jury submitted a question to the district court. The jury inquired whether the term "care or custody" was defined in the Idaho Code, and if not, how did the relevant law define the term. The district court, with the stipulation of the parties, responded by instructing that the term "care or custody" is not specifically defined in the Idaho Code or in relevant cases from the Idaho Appellate Courts and thus, the jury should give that term its common understanding when applying the instructions given by the court.

At 11:30 p.m., the district court sent a note to the jury. It asked whether the jury wished to continue deliberating or return for further deliberation the next morning. The court offered to have staff remain present to assist or the jurors could recess until Saturday morning if the jury felt it could make progress the next day. The jury responded with a note stating the jury felt it could decide the case that same night. It stated the jury was making progress and it also stated that Saturday morning was an impossibility for several of the jurors. Approximately forty-five minutes later, the guilty verdicts were returned by the jury. It appears the jurors had questions regarding the "care or custody" element and struggled to resolve that issue.

This Court has spoken and, to some extent, clarifies the definition of "care or custody" for future cases. We have held, in essence, that when a child resides in an adult person's home, and that person sometimes or occasionally watches [2] that child, and that

---

1. Morales and his wife, Erendira, were tried jointly. Morales's wife had separate counsel and participated in the proceedings with the assistance of an interpreter. It is unclear why Morales did not have an interpreter, despite his testimony that his English was limited. Morales's difficulty with the English language is reflected in the transcript of Morales's testimony.

2. The evidence in the record did not elaborate on what constitutes watching or babysitting a twenty-one-month-old child. Detective White testified that Morales stated in his interrogation that he fed the *kids* lunch once in a while and checked on *them* during the day. Officer Rebollozo testified that Morales's wife stated in her interrogation that Morales changed E.H.'s diaper once and, after the second injury incident, he started

person further renders repeated aid for the child's injuries, that person is deemed to have "care" of the child and is subject to prosecution under the injury to a child statute.

Morales's brief cited to three cases from other jurisdictions that have similar statutes prohibiting injuries to children. These other jurisdictions—with the exception of Maryland, where the facts of the case are distinguishable—have determined that the term "care or custody" should be given its ordinary meaning or have relied on dictionary definitions to define the term.

In *People v. Culuko*, 78 Cal.App.4th 307, 92 Cal.Rptr.2d 789 (2000), the Court concluded that the victim was in the "care or custody" of Garcia, stating that:

> "[There is] no special meaning to the terms 'care and custody' beyond the plain meaning of the terms themselves. The terms 'care or custody' do not imply a familial relationship but only a willingness to assume duties correspondent to the role of a caregiver." (Quoting *People v. Cochran*, 62 Cal.App.4th 826, 832, 73 Cal. Rptr.2d 257, 261 (1998)). Here, *Garcia and Culuko were living together as husband and wife, in one room, with a baby.* Strawn testified that *Garcia took care of the baby; at times, Garcia was left alone with the baby.* When interviewed by police, *Garcia admitted he bathed the baby, changed the baby, and gave the baby a bottle at 2:30 a.m.* Finally, and most significantly, Roberts testified that, five days before Joey died, *Garcia said he was taking full responsibility for caring for the baby so the baby would bond with him*

*Id.* at 808 (emphasis added).

In *State v. Jones*, 188 Ariz. 388, 937 P.2d 310 (1997), the Arizona Supreme Court employed the same dictionary definition of "care" we have relied upon when it determined that "both 'custody' and 'care,' as they relate to A.R.S. § 13–3623, imply accepting responsibility for a child in some manner." *Id.* at 314. The Arizona Court then found that the "*defendant provided food and shelter for the family. He acted as a caregiver*

*to all of Gray's children and was, in essence, their stepfather,* although not married to their mother. [The victim] testified that she had to ask permission of her mother or defendant before she could go outside and play." *Id.* at 316. (Emphasis added). The Arizona Court concluded that there was substantial evidence to find that the defendant had the "care or custody" of the victim.

In *Pope v. State*, 284 Md. 309, 396 A.2d 1054 (1979), the statute involved provided, in pertinent part, that "any parent, adoptive parent or other person who has the permanent or temporary care or custody or responsibility for the supervision of a minor child ..." may be found guilty of a felony for mistreating a child. MD. ANN.CODE art. 27, § 35A(a) (1966). Pope had met a young mother and her daughter (the victim) at a church service on Friday night and invited them to stay with her. The daughter and her mother spent two nights at Pope's house, as the child died as a result of injuries committed by the young mother on Sunday. The *Pope* Court, relying on prior case law, concluded that "temporary care or custody" is synonymous with "*in loco parentis.*" The Court went on to define "*in loco parentis*" as referring "to a person who has put himself in the situation of a lawful parent by assuming the obligations incident to the parental relation without going through the formalities necessary to legal adoption. It embodies the two ideas of assuming the parental status and discharging the parental duties." *Pope*, 396 A.2d at 1063.

The cases from these other jurisdictions explicitly or implicitly require more than an occasional babysitting or watching of a child. This is in stark contrast to our holding today. The practical effect in Idaho is that, while the state may not be able to identify in situations like the one before us who the abuser is, the broad definition of "care or custody" will hold any adult living in the household accountable, even if the adult's oversight of the child is considered minimal.

going home from his work in the farm fields at

10:00 a.m. to check on the *babies.*