IN THE SUPREME COURT OF THE STATE OF IDAHO
Docket No. 44892

STATE OF IDAHO,                      )
                                     )
    Plaintiff-Respondent,        )        Boise, May 2018 Term
                                     )
v.                                   )        Filed: August 3, 2018
                                     )
SHANE A. KRALY,                      )        Karel A. Lehrman, Clerk
                                     )
    Defendant-Appellant.         )
                                     )
                                     )

Appeal from the District Court of the First Judicial District, State of Idaho, Boundary County. Hon. Barbara A. Buchanan, District Judge.

The judgment of the district court as to Count II is <u>vacated</u>.

Nevin, Benjamin, McKay & Bartlett LLP, for Appellant. Dennis Benjamin argued.

Hon. Lawrence G. Wasden, Attorney General, for Respondent. Kale Gans argued.

_____

BEVAN, Justice.

Shane A. Kraly appeals from a judgment of conviction following a jury trial where he was found guilty of various charges, including injury to child, in violation of Idaho Code section 18-1501(1). Kraly argues that the jury verdict as to the injury to child charge was not supported by sufficient evidence to conclude that he assumed care or custody of the minor child, M.M. We vacate the district court's judgment of conviction and remand this case with instructions for the entry of a judgment of acquittal as to Count II—the injury to child charge. However, Kraly's other convictions remain.

## I. FACTS AND PROCEDURE

On April 27, 2016, M.M. met Kraly on social media through a mutual friend. M.M., who was seventeen at the time, told Kraly she was nineteen. Kraly, who was thirty, told M.M. that he was twenty-five. After they exchanged messages through social media, they shared phone

numbers and started texting. After an extensive and explicit conversation, M.M. agreed that Kraly would come to her room, stay the night, and they would have sex.

Kraly drove to M.M.'s residence that evening. At the time, M.M. lived with her father, but her bedroom was in a separate building on the property and was not connected to the main house. When Kraly arrived, M.M. met him outside and showed him to her room.

Once inside her room, they made small talk, and Kraly asked her if she wanted to use methamphetamine. M.M. testified that this "freaked [her] out," and she said, "No, not really." She further testified that she had never done methamphetamine before, was terrified of needles, and had seen the impact drugs can have on a person's life because her uncle was an addict. Although she did not want to do methamphetamine, Kraly persisted until M.M. "just finally said yes" because "no wasn't good enough." Kraly then put a syringe without a needle into M.M.'s anus and injected methamphetamine into her rectum.

M.M. testified that after Kraly injected methamphetamine into her rectum her head hurt "really bad" and she suddenly "didn't care" about her surroundings. Shortly after Kraly injected M.M. he showed her how to use methamphetamine. M.M. testified that Kraly had a little baggie with crystals in it, a knife, and a spoon. Once he finished crushing the crystals and mixed the drug with water, Kraly used a syringe with a needle and injected methamphetamine into his arm. After Kraly injected himself, M.M. testified that she felt "really tired and confused." Kraly told M.M. to "trust him and it won't hurt," and, using the same needle he had just injected himself with, he injected methamphetamine into M.M.'s arm. In addition to repeatedly injecting himself, Kraly also injected M.M. with methamphetamine throughout the night. In between injections, Kraly and M.M. had sex until the following morning.

M.M. also testified that the following morning she was still high and "didn't want to go to school." Kraly drove them to a store for coffee and cigarettes, and then drove them to the Kootenai River Inn Casino. After a minute or two, they left and drove to a secluded location. While there, and while still in the truck, Kraly injected himself with methamphetamine and then injected M.M. in her arm. Kraly drove them back to the casino where they sat in the truck.

M.M. was wearing an ankle monitor pursuant to the terms of a juvenile court release order. When M.M. did not show up at school, the school called her father, and her father called M.M.'s juvenile probation officer. Using the ankle monitor's GPS coordinates, law enforcement tracked M.M. to the casino parking lot and discovered Kraly and M.M. sitting in his truck. Kraly

was later arrested and charged with rape, injury to child, possession of methamphetamine, and possession of drug paraphernalia.

After trial, a jury found Kraly guilty on all counts. On January 19, 2017, the district court sentenced Kraly to concurrent fifteen year sentences on the rape and injury to child charges with five years fixed. Kraly was also sentenced to a concurrent five year fixed sentence on the methamphetamine charge and received credit for time served on the paraphernalia charge. Kraly timely appealed his conviction on the injury to child charge.

## II. STANDARD OF REVIEW

"This Court will not overturn a judgment of conviction, entered upon a jury verdict, where there is substantial evidence upon which a reasonable trier of fact could have found that the prosecution sustained its burden of proving the essential elements of a crime beyond a reasonable doubt." *State v. Knutsen*, 158 Idaho 199, 206, 345 P.3d 989, 996 (2015) (internal quotations and citation omitted). As such, this Court "view[s] the evidence in the light most favorable to the prosecution, and we do not substitute our judgment for that of the jury regarding the credibility of witnesses, the weight of the evidence, and the reasonable inferences to be drawn from the evidence." *Id.* (internal quotations and citation omitted). "Evidence is substantial if a reasonable trier of fact would accept it and rely upon it in determining whether a disputed point of fact has been proven." *State v. Smith*, 161 Idaho 782, 790, 391 P.3d 1252, 1260 (2017) (internal quotations and citation omitted).

This Court exercises free review over statutory interpretation because it is a question of law. *Saint Alphonsus Reg'l Med. Ctr. v. Raney*, 163 Idaho 342, ___, 413 P.3d 742, 745 (2018).

> The objective of statutory interpretation is to derive the intent of the legislative body that adopted the act. Statutory interpretation begins with the literal language of the statute. Provisions should not be read in isolation, but must be interpreted in the context of the entire document. The statute should be considered as a whole, and words should be given their plain, usual, and ordinary meanings. It should be noted that the Court must give effect to all the words and provisions of the statute so that none will be void, superfluous, or redundant. When the statutory language is unambiguous, the clearly expressed intent of the legislative body must be given effect, and the Court need not consider rules of statutory construction.

*Id.* (quoting *State v. Dunlap*, 155 Idaho 345, 361–62, 313 P.3d 1, 17–18). "A statute is ambiguous where the language is capable of more than one reasonable construction." *Id.* "Only where the language is ambiguous will this Court look to rules of construction for guidance and

3

consider the reasonableness of proposed interpretations." *City of Idaho Falls v. H-K Contractors, Inc.*, 163 Idaho 579, ___, 416 P.3d 951, 954 (2018).

### III. ANALYSIS

#### A. The statute is not ambiguous.

We recognize that a statute is not ambiguous simply because the parties present differing interpretations to the court. *Idaho Falls*, 163 Idaho at ___, 416 P.3d at 954. (citing *Stonebrook Const., LLC v. Chase Home Fin.*, 152 Idaho 927, 931, 277 P.3d 374, 378 (2012)). The terms "care or custody" are not ambiguous despite the parties' differing definitions. The State advocates that "care or custody" extends beyond a formal parent-child relationship, focusing on whether the defendant controlled or supervised a minor. In particular, the State cites to cases in which a party had "control" of children while driving those children in a motor vehicle. *See State v. Anspach*, 627 N.W.2d 227 (Iowa 2001). Accordingly, the State equates "care or custody" to "control," arguing that the evidence established Kraly's "control" over M.M., thus subjecting him to the strictures of section 18-1501.

Kraly, on the other hand, cites Idaho precedent in advocating that "care or custody" is to be defined by its "ordinary meaning . . . and the context in which it is used." *State v. Morales*, 146 Idaho 264, 267, 192 P.3d 1088, 1091 (Ct. App. 2008). Kraly further advocates that "both 'custody' and 'care,' . . . imply accepting responsibility for a child in some manner." *Id.* (citing *State v. Jones*, 937 P.2d 310, 314 (Ariz. 1997)).

For purposes of our analysis we apply the plain and ordinary meaning of custody and control as did the Court of Appeals in *Morales*:

> "Care" is defined as "CHARGE, SUPERVISION, MANAGEMENT: responsibility for or attention to safety and well-being." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 338 (1993). *See also People v. Culuko*, 78 Cal.App.4th 307, 92 Cal.Rptr.2d 789, 808 (2000) (holding that there is " 'no special meaning to the terms "care and custody" beyond the plain meaning of the terms themselves. The terms "care or custody" do not imply a familial relationship but only a willingness to assume duties correspondent to the role of a caregiver.' " (quoting *People v. Cochran*, 62 Cal.App.4th 826, 73 Cal.Rptr.2d 257, 261 (1998))).

*Id.* at 267, 192 P.3d at 1091. Additionally, we rely upon this Court's analysis in *Beers v. Corp. of President of Church of Jesus Christ of Latter-Day Saints*, 155 Idaho 680, 316 P.3d 92 (2013),

which sheds light on the question of "care or custody" by requiring that to find a party responsible for the care or custody of a minor there must exist "an affirmative duty of care" between the adult and the minor. This affirmative duty is shown by: 1) a special relationship between the defendant and the child; or 2) an assumed duty towards the child. *Id.* at 686, 316 P.3d at 98. Under this standard Kraly did not have "care or custody" of M.M. during the hours he spent with her and his conviction of injury to child must be vacated.

**B.    There was insufficient evidence to convict Kraly of injury to child.**

The jury found Kraly guilty of injury to child as defined in Idaho Code section 18-1501(1), which states:

> (1) Any person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or *having the care or custody* of any child, willfully causes or permits the person or health of such child to be injured, or willfully causes or permits such child to be placed in such situation that its person or health is endangered is punishable by imprisonment in the county jail not exceeding one (1) year, or in the state prison for not less than one (1) year nor more than ten (10) years.

(Emphasis added).

Whether one has the "care or custody" of a minor is dependent upon the relationship between the parties. Generally, there is no affirmative duty to act or assist to protect another, even a child, absent unusual circumstances which justify imposing such an affirmative responsibility. Restatement (Second) of Torts § 314 (1965); *Coghlan v. Beta Theta Pi Fraternity*, 133 Idaho 388, 399, 987 P.2d 300, 311 (1999). Idaho recognizes such unusual circumstances in two situations:   1) when a special relationship exists between the parties; or 2) when one undertakes a duty to protect another. *Beers*, 155 Idaho at 686, 316 P.3d at 98. While questions of duty are generally reserved for tort cases, they can be instructive in resolving whether Kraly had care or custody of M.M. while engaging in the conduct set forth above.

1.    There was insufficient evidence to show a special relationship existed between Kraly and M.M.

The first way to establish "care or custody" is to show that a special relationship exists between the child and the defendant. A special relationship can be shown in two separate, but related ways:  "(a) [if] a special relation[ship] exists between the actor and a third person which

5

imposes a duty upon the actor to control the third person's conduct, or (b) [if] a special relation[ship] exists between the actor and the other which gives the other a right to protection." *Turpen v. Granieri*, 133 Idaho 244, 248, 985 P.2d 669, 673 (1999) (quoting Restatement (Second) of Torts § 315 (1966)). Thus, a special relationship exists when one has control over a child or an affirmative duty to aid or protect that child.

This Court has provided examples of individuals who have a duty to control another, such as "a parent's duty to control his child, an employer's duty to control an employee, or a law enforcement officer's duty to control a dangerous prisoner." *Id*. Other special relationships that give rise to a duty to aid or protect include common carriers, innkeepers, one who is required by law to take custody of another, and one who voluntarily takes custody of another. Restatement (Second) of Torts § 314A (1966). The evidence in this case does not establish that Kraly had a special relationship with M.M.

This result is supported by our decision in *Beers*. There, Heidi, a minor, was attending a campout organized by members of her church when she was injured after jumping from a bridge into the Payette River. 155 Idaho at 682–83, 316 P.3d at 94–95. Her parents brought suit against the church and fourteen other individual defendants. *Id.* at 683, 316 P.3d at 95. One of the claims alleged against the individual defendants was the tort of child abuse, based upon Idaho Code sections 6-1701 and 18-1501. *Id.* at 690–91, 316 P.3d at 102–03. The defense moved for summary judgment as to this statutory claim; the trial court denied the motion as to four individual defendants who were present when Heidi was injured. *Id.* This Court reversed, holding that the individual defendants could not be held liable because "[u]nder the plain text of [Idaho Code section 18-1501], this duty only extends to those 'having the care or custody of [the] child.' . . . [N]one of the Ward members had 'the care or custody of' Heidi" because no special relationship existed. *Id*. at 692, 316 P.3d at 104.

With similar logic, we hold that there was insufficient evidence in this case for a reasonable trier of fact to find that Kraly had the "care or custody" of M.M. beyond a reasonable doubt. M.M. was a 17-year-old child who agreed that Kraly could come to her residence and engage in sex. While Kraly, as the adult, was appropriately held responsible for several crimes because of his behavior with M.M., he did not develop a special relationship with M.M. sufficient to establish he had "care or custody" of her. M.M. and Kraly engaged in lengthy conversations, she invited him into her bedroom, she used methamphetamine with him, she had

6

sex with him, and she got into his truck the next morning in order to skip school. This was not a custodial relationship, such as a parent, employer, or innkeeper. Instead, it was an unlawful social relationship that did not rise to the level of a *special relationship* that would place M.M. under Kraly's control or in his custody under Idaho Code section 18-1501.

This "relationship" was unlawful on several levels. Kraly was convicted of rape and likely was also guilty of lewd conduct with a minor and aggravated battery, crimes which were not charged. Our reference to their interaction as a "social relationship" does not discount the illegality of Kraly's conduct in any respect; instead, it simply highlights the lack of a legally sufficient "special relationship" with which to establish the crime of injury to child under section 18-1501.

    2.  <u>There was insufficient evidence to show Kraly assumed a special duty of care.</u>

The second way to establish "care or custody" is to show an assumed duty of care. As noted above, the term "care" is defined as "CHARGE, SUPERVISION, MANAGEMENT: responsibility for or attention to safety and well-being." Webster's Third New International Dictionary 338 (1993)). The facts of this case do not indicate Kraly assumed such a duty of care for M.M.

In *Morales*, the defendant sought to overturn his conviction under Idaho Code section 18-1501(1) by asserting there was insufficient evidence to show that the injured child was in his "care or custody," and that there was insufficient evidence to show that he "willfully" permitted the injured child to be "placed in a situation where his health was endangered." 146 Idaho at 266, 192 P.3d at 1090. The facts in *Morales* revealed that the injured child lived with the defendant for over three months, that the defendant admitted to watching the injured child during the day, and the defendant would sometimes watch the injured child when his mother left the house. *Id.* at 267, 192 P.3d at 1091. The court held that there was substantial evidence that the defendant regularly assumed, shared, and discharged joint responsibility for the care, custody, and well-being of his nephew. *Id.* at 268, 192 P.3d at 1092.

The *Morales* court cited three cases from other jurisdictions that had statutes similar to section 18-1501 regarding injuries or death to minors who are in one's "care or custody." Each of those cases highlighted the factual differences between one who had assumed the "care" of a minor child, and one who had a merely fleeting relationship with a child. For example, in *People v. Cochran*, 73 Cal. Rptr.2d 257, 261 (Cal. Ct. App. 1998), the defendant, who was the mother's

boyfriend, was convicted of assault resulting in the death of a child. After dating for a short time, the defendant asked the mother and child to move into his home where he lived with his grandparents. *Id.* The mother described the defendant as the child's "surrogate father" because he watched her, bathed her, fed her, and put her down for naps. *Id*. On the night the child died, the defendant volunteered to put her down for a nap after she became fussy. *Id.* at 259. The mother later found the child tucked in bed, gray in color with no pulse. *Id*. The defendant was charged with the death of the child pursuant to California Penal Code section 273ab, that required he have the "care or custody of [the] child." *Id*. at 260. The defendant claimed he could not be convicted under section 273ab because he had no duty to care for the child. *Id.* The court found substantial evidence existed to find the defendant had "care or custody" of the child because his actions demonstrated he assumed a parent-like role and accepted responsibility for the child. *Id.* at 261.

Similarly, in *People v. Culuko*, 92 Cal. Rptr.2d 789 (Cal. Ct. App. 2000), a child was killed after a blow to the child's stomach ruptured an artery at the back of his abdomen. *Id.* at 793. The defendant, who was the mother's boyfriend, lived with the family, and was convicted under the same statute as the defendant in *Cochran*, which required he have the "care or custody" of the child. *Id.* at 807. The defendant challenged his conviction, arguing, among other things, that there was insufficient evidence to prove he had care or custody of the child. *Id.* at 807. The court held that the "terms 'care or custody' do not imply a familial relationship but only a willingness to assume the duties correspondent to the role of caregiver." *Id.* at 808 (citing *Cochran*, 73 Cal. Rptr.2d at 261). The court affirmed the defendant's conviction, finding the he had "care or custody" of the child because he was living with the child, took care of him, was left alone with him, bathed him, changed him, fed him, and stated that "he was taking full responsibility for caring for the baby so the baby would bond with him." *Id.*

Finally, the Court of Appeals also noted *State v. Jones*, 937 P.2d 310, 314 (Ariz. 1997), which employed the same definition of "care" as Idaho courts when it determined "both 'custody' and 'care,' as they relate to A.R.S. section 13-3623, imply accepting responsibility for a child in some manner." In *Jones*, the defendant shared a trailer with a mother and her three children for three months. *Id.* The victim in the case was the mother's youngest daughter. *Id.* at 313. Prior to her death, the daughter was severely beaten and sexually assaulted, and all of the evidence implicated the defendant. *Id.* Section 13-3623 provided criminal liability when a

8

person, while having "care or custody of [a] child, . . . causes or permits the health of a child to be injured or causes or permits the child to be placed in a situation where its person or health is endangered." *Id.* at 314 (citing and quoting A.R.S. § 19-3623(B)) (internal quotations omitted). The defendant argued that he did not have care or custody of the victim, as required by the statute. *Id.* The Arizona Court, using the same general definitions for care and custody as we have in this Opinion, found that the defendant assumed voluntary responsibility for the daughter. *Id.* at 316. The court affirmed the defendant's conviction, finding that he acted as a caregiver to the daughter, and was, in essence, the daughter's stepfather. *Id.*

Using these cases as guidance, we reiterate and clarify the definition of "care" as utilized in section 18-1501. Specifically, an individual has a duty imposed by law to "care" for a child when that individual acts as a caregiver to the child. As a result, the relevant question becomes whether that individual has assumed, implicitly or explicitly, the responsibilities to shelter, feed, clothe and/or protect a child. An individual's actions that demonstrate the individual engaged in caregiver responsibilities may establish that he or she had "care" for the child, much like the child's uncle in *Morales*.

In addition, we reject the State's argument that Kraly had the "care" of M.M. while they were together in Kraly's truck. In one of the cases cited by the State in support of its argument, *State v. Anspach*, *supra*, the defendant was held responsible for child endangerment under Iowa Code section 726.6 when he attempted to evade police while four young children rode with him in the cab of his truck. 627 N.W.2d at 234. Section 726.6 placed criminal responsibility upon a person who injures or places a child at risk, while that child is in his custody or *control*. *Id.* Pursuant to that legal standard, the court held that the defendant "had control over the instrumentality contributing to the risk to the children in the truck. . . . [T]he meaning of control 'applies to a person who has the ability to control the risk that the statute prohibits.' " *Id*. at 235.

Unlike the Iowa statute, the lynchpin for establishing "care" under section 18-1501 is not control—it is responsibility. Stated another way, one who has the "care" of another also must have control of that person as well; but, one who has control of another does not always have "care" of that individual in a legal sense. For example, an individual could have control *and* care for a child where the individual has developed a special relationship with the child or assumed a duty of care, as we hold herein. *See Beers*, 155 Idaho at 689, 316 P.2d at 101 (a *special relationship* requires a right and an ability to control the conduct of the third party). If so, that

individual could be held responsible for violating section 18-1501 by criminally operating a motor vehicle with a child present for whom he or she is responsible; for example, if such an individual acted recklessly, willfully eluded the police, or operated a motor vehicle while under the influence of alcohol. In any of these scenarios, or in a myriad of others we have not described, the individual could be held liable under section 18-1501.

In this case, there was insufficient evidence that Kraly assumed "care" for M.M. while they drove in his truck to get coffee and cigarettes, while they were parked in a secluded area, or when parked in the casino parking lot. "Liability for an assumed duty . . . can only come into being to the extent that there is in fact an undertaking." *Id.* at 688, 316 P.3d at 100. The facts in this case cannot support the conclusion that Kraly assumed a special relationship with M.M. while they were in Kraly's truck or in M.M.'s room. Instead, the evidence established that a social relationship was formed that began on social media then progressed through text messages, drug use, sexual contact, and social outings. Kraly's conduct and the circumstances of the interactions between him and M.M. did not amount to Kraly's having "care" for M.M., just because some of their interactions occurred in a motor vehicle. As noted above, the conduct by the defendants in *Morales*, *Cochran*, *Culuko*, and *Jones* involved criminal conduct by caregivers—those who had assumed *responsibility*. These responsibilities included watching, bathing, feeding, and, in all cases, living with the children. These assumed duties all fall within the definition of "care": charge, supervision, and/or management. The assumption of such duties are markedly absent in Kraly's relationship with M.M.

Thus, there was insufficient evidence that Kraly, through his conduct, assumed the duties of a caregiver to M.M.: he did not watch her, he did not provide her food or shelter, and he did not live with her. Accordingly, we conclude, as a matter of law, there was insufficient evidence to support the jury verdict that Kraly assumed a duty to M.M.

## IV. CONCLUSION

For the above-stated reasons we conclude that the evidence was not sufficient to sustain a finding that Kraly had the "care or custody" of M.M. which was required to sustain a conviction under Idaho Code section 18-1501. Therefore, we vacate the district court's judgment of conviction as to Count II and remand this case with instructions for the entry of a judgment of acquittal as to Count II.

Chief Justice BURDICK, Justices HORTON, BRODY and Justice *pro tem* HUSKEY CONCUR.